WELCH, Presiding Judge.
Mario Dion Woodward was indicted by a Montgomery County grand jury on two counts of capital murder for his involvement in the shooting death Keith Houts, a City of Montgomery police officer. Count 1 alleged that Woodward intentionally killed Officer Houts while Houts was on duty, see § 13A-5-40(a)(5), Ala.Code 1975, and count 2 alleged that Woodward killed Houts by firing a weapon from inside a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975. Woodward was tried before a jury, and the jury found him guilty on both counts of capital murder. Following a sentencing hearing, the jury recommended, by a vote of 8-4, that the trial court impose a sentence of life imprisonment without the possibility of parole. A separate sentencing hearing was held before the trial court and after that hearing, the trial court overrode the jury’s verdict and sentenced Woodward to death. This appeal follows.

Facts

Montgomery police officer Keith Houts was on patrol in a neighborhood in north Montgomery on September 28, 2006, and he conducted a traffic stop at approximately 12:30 p.m. Shonda Lattimore testified that she was sitting on her porch when she saw a police officer begin to execute a stop on a gray Impala automobile being driven by a black man wearing a red hat. Latti-more testified that she saw the driver of the Impala reach down for something as the Impala and the police car, with its emergency lights on, passed by the end of her street, before they went out of sight. Soon after the cars passed out of her sight, she heard four or five gunshots fired.
During the traffic stop Officer Houts entered the license tag of the Impala into the mobile data terminal in his patrol car; the vehicle was registered to Morrie Surles. Officer Houts’s patrol car was equipped with a video camera that recorded the events that occurred during the stop. The video recording was played for the jury. The video showed that Houts got out of his patrol car and approached the driver’s side door of the Impala. Just as Officer Houts reached the door, the driver of the Impala fired a gun and shot Officer Houts in the jaw. Medical testimony established that the bullet entered Officer Houts’s neck and severed his spine, causing him to collapse instantly. The driver then reached his arm out of the vehicle and shot Officer Houts four more times. The driver fled the scene in the Impala. Although the dashboard camera captured the shooting on videotape, it did not reveal the identity of the assailant because Officer Houts’s patrol car was positioned behind the Impala and because the assailant did not get out of the vehicle.
Although Officer Houts survived the shooting, he never regained consciousness, and he died two days later.
The police determined that the Impala was registered to Morrie Surles (“Mor-rie”). Morrie testified that she had purchased the Impala for her daughter, Tiffany Surles (“Surles”).
At around 9:30 on the morning of the shooting, Woodward visited a family friend, Shirley Porterfield. According to *1000 Porterfield, Woodward was driving a light-colored Impala, and he was wearing blue jeans, a white t-shirt, and a red fleece jacket. At approximately the same time the shooting occurred, Sharon Shephard, a Montgomery Animal Control officer driving in the area, saw an Impala being driven by a dark-skinned male pass by her at a high rate of speed.
During the evening on the date the shooting occurred Surles’s Impala was found burned in a Montgomery neighborhood. Thalessa Shipman testified that she was a captain of the “Neighborhood Watch” for her street. She said that she heard a loud car driving around the neighborhood on the night of September 28, 2006. The car stopped at her driveway in the cul-de-sac, then backed up to an empty lot located next to her lot. She identified the car as a dark-colored Dodge Neon. Shipman looked over the fence into the empty lot and saw a light-colored car there, and someone standing beside that car. Seconds later, the light-colored car went up in flames, and the person who had been standing next to the burning car jumped into the Neon, and the Neon sped away. Shipman contacted law-enforcement authorities, and they later identified the Impala as being registered to Morrie Surles based on the vehicle-identification number. Additional evidence established that a friend of Woodward’s, Joseph Prin-gle, owned a black Dodge Neon that had a loose muffler and was loud. The State played a video recording of Pringle’s Neon for Shipman, and she identified the sound of the car as the one she had heard on the night the car was burned in her neighborhood. A detective involved in the murder investigation received information about a black Dodge Neon, and on the day of the murder he and his partner located the car. Joseph Pringle was in the driver’s seat, and another man was in the passenger seat; the trunk of the vehicle was open. A third man was standing next to the car, speaking to Pringle; that man was holding a gas can.
Tiffany Surles, Woodward’s girlfriend at the time of the shooting, testified that in September 2006 she was living with Woodward in an apartment they had rented together. During the evening of September 27, 2006, Surles and Woodward argued, and Woodward left the apartment in her Impala, and he returned later that night. Surles testified that the following morning, on the day Officer Houts was shot, she was taking a shower when Woodward left the apartment again. Woodward had the keys to her Impala the night before, and the Impala was gone. Surles had decided the night before that she was going to move out of the apartment. After Woodward left the apartment on the morning of the shooting Surles telephoned a friend, Wendy Walker, and asked her to help Surles move out of the apartment. Walker and Surles moved Surles’s personal belongings to Walker’s apartment, and the two women decided to drive to Birmingham to go shopping. Woodward telephoned Surles before she and Walker left for Birmingham, and he wanted Surles to meet him. Surles testified that Woodward met them at Walker’s apartment complex and that he got out of a small, dark car. Walker testified that the car Woodward got out of was a black Neon. Neither woman saw Surles’s Impala.
Woodward joined Surles and Walker in Walker’s vehicle, and they drove to Birmingham. Surles and Walker testified that during the trip to Birmingham Woodward said that he had “messed up” and that he had shot a police officer who pulled him over. Walker testified that Woodward spoke on his cellular telephone during the trip and that she had heard him tell someone to “get rid his girl[’s] car.” (R. 963.) Surles stated that Woodward *1001 told her that he had taken care of her car. Surles said she did not get her car back. Walker and Surles testified that Woodward threw something out of Walker’s vehicle while they were en route to Birmingham. Walker testified that the object Woodward threw was a gun.
Walker and Surles testified that in Birmingham they went to the Century Plaza shopping mall. Woodward bought a change of clothing and then asked the women to drop him off at a building near the Valleydale exit of the interstate. Vernon Cunningham testified that he is acquainted with Woodward, and that Woodward telephoned him on September 28, 2006, and wanted to meet with him. Cunningham arranged to meet with Woodward and said two girls dropped Woodward off at the arranged meeting place on Valley-dale Road in Birmingham later that day. Cunningham drove Woodward to Cunningham’s house. On the way to Cunningham’s house, they stopped at a grocery store; a videotape from the store’s security camera showed that Woodward was wearing blue-jean shorts, a red sweatshirt, and a red baseball cap with a white emblem on the front. After they arrived at Cunningham’s house, Woodward gave Cunningham the sweatshirt and red baseball cap he had been wearing, and he told Cunningham to burn them. Cunningham testified that he burned the items in his outdoor grill, and the police found remnants of clothing in that grill. Cunningham also testified that Woodward told him that he had shot a police officer during a traffic stop.
Cunningham testified that Woodward asked for a ride and Cunningham agreed to take him to a local restaurant. Roderick Jeter picked Woodward up at the restaurant and drove Woodward to Atlanta, where he dropped Woodward off at a gas station.
Montgomery police detectives interviewed numerous witnesses, and, from the information they received, they determined that Woodward had confessed to shooting Officer Houts and that he was then in Atlanta.
Deputy United States Marshal Joe Parker testified that a be-on-the-lookout, or “BOLO,” had been issued for Woodward in the Atlanta area and that on the day after the shooting he recognized Woodward while he was at a gas station in Atlanta. Parker arrested Woodward. He further testified that, at the time of the arrest, Woodward spontaneously exclaimed, ‘What’s going on? I didn’t shoot anybody.” (R. 1114.)
Records custodians for two cellular telephone companies testified about calls placed from Woodward’s cellular telephones and as to which towers in Montgomery and Birmingham that the calls were routed through. That testimony established that Woodward was in the area where Officer Houts was shot at the same time the shooting took place.
Finally, Agent A1 Mattox from the Alabama Bureau of Investigation testified that he had reviewed and attempted to enhance the videotape from Officer Houts’s dashboard camera. He testified that it appeared from the videotape that the person who killed Officer Houts was a black male.
The jury returned verdicts finding Woodward guilty on both counts, and the case proceeded to the penalty phase.
At the sentencing hearing before the jury, the State attempted to prove three statutory aggravating circumstances: that Woodward had been previously convicted of a felony involving the use or threat of violence, § 13A-5-49(2), Ala.Code 1975; that Woodward committed the murder to avoid or to prevent a lawful arrest, § 13A-5-49(5), Ala.Code 1975; and that Wood *1002 ward committed the murder to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws, § 13A-5-49(7), Ala.Code 1975. The State presented evidence of Woodward’s 1990 conviction for manslaughter.
Woodward did not rely on any statutory mitigating circumstances, § 13A-5-51, Ala. Code 1975, but he did seek to establish nonstatutory mitigating circumstances as provided in § 13A-5-52, Ala.Code 1975: that Woodward’s childhood was difficult, that his family loved him, and that he loved his family. The defense presented evidence about abuse Woodward had suffered as a child. The defense also presented evidence about Woodward’s involvement in the lives of his five children who, at the time of trial, ranged in age from four years to nine years.
The jury entered specific written findings as to the proffered aggravating circumstances. The jury found two of the proffered aggravating circumstances to exist, but it determined that Woodward did not murder Officer Houts to avoid a lawful arrest. The jury recommended, by a vote of 8-4, that the trial court sentence Woodward to life imprisonment without the possibility of parole.
The trial court held a separate sentencing hearing. After considering the evidence from the trial, the presentence-in-vestigation report, and additional evidence presented at the separate sentencing hearing, the trial court sentenced Woodward to death.

Analysis

Woodward raises 24 issues in his brief, many of which he did not first raise in the trial court. Because Woodward was sentenced to death, his failure to object at trial does not bar appellate review of those issues. Rule 45A, Ala. R.App. P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
The Alabama Supreme Court has explained that the plain-error rule is to be applied sparingly:
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998).”
Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008), quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999) (additional citations omitted in Ex parte Brown).
Although Woodward’s failure to object at trial will not preclude review of any allegation of error, his failure to object will weigh heavily against any claim of prejudice he now makes. See, e.g., Phillips v. State, 65 So.3d 971, 986 (Ala.Crim.App.2010); Williams v. State, 601 So.2d 1062, 1066 (Ala.Crim.App.1991), aff'd, 662 So.2d 929 (Ala.1992). The prejudice alleged must be substantial before a finding of plain error will result. Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) (“To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial *1003 impact on the jury’s deliberations”), aff'd, 778 So.2d 237 (Ala.2000). Finally, “the plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Guilt-phase Issues

I.
Woodward argues that the trial court erred when it prohibited the defense from presenting the testimony of his former attorney, Tiffany McCord, during his casein-chief and that the trial court’s decision resulted in a denial of his right to present a defense as protected by the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Woodward argues that Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), provides that the exclusion of testimony violates a defendant’s right to present a defense if it infringes on a “weighty interest of the accused,” and if it is arbitrary or disproportionate to the purpose it is designed to serve, that he had a weighty interest in presenting McCord’s testimony, and that the trial court’s ruling excluding that testimony was arbitrary and disproportionate.
During the State’s case-in-chief Agent Joe Parker of the United States Marshal’s Service testified that he saw Woodward at a gas station in Atlanta, Georgia, and arrested him there. Parker testified that, immediately upon being taken into custody, Woodward spontaneously said, “What’s going on? I didn’t shoot anybody.” (R. 1114.) On cross-examination the defense asked Parker whether Woodward also said that he had been in contact with his attorney and “was looking to turn himself in.” (R. 1115.) Parker testified that Woodward did not make that statement in front of him, nor did he hear of such a statement after Woodward was taken into custody.
After the State presented its case-in-chief, Woodward notified the trial court that he intended to call Tiffany McCord— an attorney who was representing Woodward on another matter at the time of the shooting — to testify that Woodward had contacted her before his arrest, and that “as a result of that, she contacted the Montgomery Police Department to try to make arrangements to turn him in.” (R. 1233.) The trial court told him that if he called McCord to testify, he would waive his attorney-client privilege, and McCord would be subject to cross-examination on all conversations she had had with Woodward. The defense indicated that it wanted to limit the questioning of McCord for the purpose of showing that she had had contact with Woodward and that she had then contacted the Montgomery Police Department to facilitate Woodward’s turning himself in. The defense further stated that Parker’s testimony that Woodward had said “I didn’t shoot anybody” was “totally incriminating” and that McCord’s testimony would show that Woodward “was already aware that he was, basically, sought after.” (R. 1238.) The trial court stated that Parker’s testimony about Woodward’s statement was not prejudicial because the police had contacted McCord, Surles, and Wendy Walker,[1] “so the fact that the police were looking for him should *1004 have come as no surprise.” (R. 1238.)[2] The trial court stated that the defense had two problems if McCord testified: first, McCord had not been listed as a witness and, when the defense stated its intention to call her, McCord informed the court that she knew members of the jury; second, the court again stated that it did not believe the defense could reveal only part of her conversations with her client, “And for all I know, he confessed to [McCord] too.” (R. 1241 — 42.) The trial court then denied Woodward’s request to allow him to call McCord as a witness. Woodward did not make an offer of proof to establish what McCord would have testified to if the trial court had permitted the testimony.
Woodward now argues that McCord’s testimony would have rebutted Parker’s testimony about the statement Woodward made when he was taken into custody. Specifically, Woodward argues:
“Agent Parker’s testimony that Mr. Woodward said T didn’t shoot anybody1 upon his arrest could only mean that Mr. Woodward knew that he was being arrested for shooting someone. The only inference the jury could have drawn was that the reason Mr. Woodward knew that he was being arrested for shooting someone was that he had, in fact, shot someone. Ms. McCord’s testimony was necessary to refute that damaging inference by providing another explanation for how Mr. Woodward knew that he was being arrested for shooting someone: that Ms. McCord had told him that he was sought by law enforcement in connection with a shooting.”
(Woodward’s brief, at p. 21.)(Emphasis added.)
Because Woodward failed to make an offer of proof as to the testimony he now claims he would have elicited from McCord, the issue was not preserved.
Rule 103, Ala. R. Evid., provides, in relevant part:
“Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
[[Image here]]
“(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.”
Rule 103(a)(2), Ala. R. Evid.
This Court reviewed a similar issue in Miller v. State, 63 So.3d 676 (Ala.Crim.App.2010), when Miller argued that the trial court erred when it prohibited him from eliciting testimony about his mental state from two witnesses. We rejected Miller’s claim because he failed to make an offer of proof, and we explained:
“Rule 103(a), Ala. R. Evid., provides that ‘[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.’ The Alabama Supreme Court has explained that ‘[w]hen the trial court sustains an objection to a question that does not on its face show the expected answer, a party must make an offer of proof and explain the relevancy of the expected answer to preserve error for appellate review.’ Ensor v. Wilson, 519 So.2d 1244, 1262 (Ala.1987) (citing Res- *1005 semer Executive Aviation, Inc. v. Barnett, 469 So.2d 1283 (Ala.1985)). ‘[I]n the absence of an offer of proof [regarding a witness’s expected answer], [appellate courts] cannot review [the exclusion of testimony]. To attempt to do so would necessitate impermissible speculation by this Court.’ Burkett v. American Gen. Fin., Inc., 607 So.2d 138, 140 (Ala.1992) (citing Ensor, 519 So.2d at 1262, and C. Gamble, McElroy’s Alabama Evidence § 425.01(4) (4th ed.1991)).
“Here, defense counsel failed to proffer what answers Smith and Dr. Goff would have given if the prosecutor’s objection had not been sustained. In fact, he withdrew the question to Dr. Goff. Because defense counsel did not proffer what the witnesses’ testimony would have been, this Court cannot determine that the exclusion of the testimony affected a ‘substantial right’ or was prejudicial. Rule 103(a), Ala. R. Evid. Accordingly, Miller failed to preserve this issue for appellate review. See Perry v. State, 568 So.2d 873, 874-75 (Ala.Crim.App.1990) (‘[B]ecause [the appellant failed] to make an offer of proof as to the expected testimony of the witness, this issue is not preserved for review.’). Therefore, this issue does not entitle Miller to any relief.”
Miller v. State, 63 So.3d at 699. See also Futral v. State, 558 So.2d 991 (Ala.Crim.App.1989).
We do not conclude that the substance of the testimony Woodward now alleges he would have elicited from McCord was made known to the court, nor do we conclude that it was otherwise fully apparent from the record. The defense stated at trial that Woodward had contacted McCord before he was arrested and that McCord had then contacted the Montgomery police, but the record does not reflect that Woodward became aware that he was wanted in connection with the shooting of Officer Houts only because McCord told him so. Because Woodward did not make an offer of proof that, in fact, Woodward learned from McCord that the police were looking for him and was not otherwise aware that he was wanted in relation to the shooting, the alleged error was not preserved. Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); Miller v. State, 63 So.3d 676 (Ala.Crim.App.2010). Because Woodward was sentenced to death, however, we must review Woodward’s claim for plain error. Rule 45A, Ala. R.App. P.
Woodward claims that the trial court’s ruling denied him his constitutional right to present a defense.
“States have substantial latitude under the Constitution to define rules for the exclusion of evidence and to apply those rules to criminal defendants. See United States v. Scheffer, 523 U.S. 303, 308 (1998). This authority, however, has constitutional limits. ‘ “Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants ‘a meaningful opportunity to present a complete defense.”” Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986), in turn quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). ‘This right is abridged by evidence rules that “infring[e] upon a weighty interest of the accused” and are “ ‘arbitrary’ ” or “ ‘disproportionate to the purposes they are designed to serve.’ ” ’ Holmes, supra, at 324 (quoting Scheffer, supra, at 308, in turn citing and quoting Rock v. Arkansas, 483 U.S. 44, 58 (1987)).”
*1006 Clark v. Arizona, 548 U.S. 735, 789-90, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006).
This Court, in considering a defendant’s claim that the trial court had erred when it excluded the testimony of a proposed defense witness, stated:
“ ‘The Sixth Amendment guarantees a defendant’s right to present a defense, including the right to call witnesses to testify on his behalf. Washington v. Texas, 888 U.S. 14, 19 (1967). Commonwealth v. Burning, 406 Mass. 485, 495, 548 N.E.2d 1242 (1990). Accord Taylor v. Illinois, 484 U.S. 400, 408-409 ( [1988]). “However, the right to call witnesses is not absolute; in the face of ‘legitimate demands of the adversarial system,’ this right may be tempered according to the discretion of the trial judge.” Commonwealth v. Burning, supra at 495, quoting United States v. Nobles, 422 U.S. 225, 241 (1975). If a judge exercises his or her discretion to limit the defendant’s right to call witnesses, the restriction cannot be arbitrary. See Washington v. Texas, supra at 23....’”
Johnson v. State, 820 So.2d 842, 859 (Ala.Crim.App.2000), quoting Commonwealth v. Drumgold, 423 Mass. 230, 668 N.E.2d 300, 313-14 (1996).
Our plain-error review of this claim is hampered by Woodward’s failure to make an offer of proof. Although Woodward argues that the trial court’s exclusion of McCord’s testimony denied him his constitutional right to present a defense because he learned from McCord that the authorities were searching for him in connection with a shooting and his spontaneous statement to Parker that he “didn’t shoot anybody,” therefore, had a noninculpatory explanation, the record before us contains no evidence for Woodward’s present argument, which is based entirely on speculation about what McCord would have said. This Court stated in Dotch v. State, 67 So.3d 936, 961 (Ala.Crim.App.2010):
“Speculation from a silent record will not support a finding of prejudice. Ex parte Walker, 972 So.2d 737, 755 (Ala.2007), cert. denied, Walker v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007). A reviewing court can not presume error from a silent record. ‘ “This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.” Webb v. State, 565 So.2d 1259, 1260 (Ala.Cr.App.1990). See also Acres v. State, 548 So.2d 459 (Ala.Cr.App.1987). Further, we cannot predicate error from a silent record. Owens v. State, 597 So.2d 734 (Ala.Cr.App.1992); Woodyard v. State, 428 So.2d 136 (Ala.Cr.App.1982), aff'd, 428 So.2d 138 (Ala.1983).’ Whitley v. State, 607 So.2d 354, 361 (Ala.Crim.App.1992).”
Quoted in Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011).
Nothing in the record before us supports Woodward’s present claim that the reason he spontaneously told the arresting officer that he had not shot anyone was that his defense attorney had informed him that he was wanted in connection with the shooting of Officer Houts. Woodward’s assertion about McCord’s testimony is not obvious from the face of the record, and it cannot, therefore, rise to the level of plain error. Plain error has been defined as error affecting the defendant’s substantial rights, and error so obvious that the court’s failure to notice it would seriously undermine the fundamental fairness of the judicial proceedings. See, e.g., Kuenzel v. State, 577 So.2d 474, 481-82 *1007 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). In Ex parte Walker, 972 So.2d 737 (Ala.2007), the Alabama Supreme Court examined Walker’s claim that the trial court had committed plain error when it admitted a videotaped statement Walker had given because, he said, the statement was taken subsequent to an unlawful arrest and was therefore inadmissible as the fruit of the poisonous tree. The Alabama Supreme Court rejected the claim because Walker failed to present more than an allegation that there was no probable cause to support his arrest. The Court then stated:
“Additionally, the alleged error is not plain because plain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error. Our precedent holds that the record must at least present an inference of error before an appellate court will hold that reversible error occurred.”
Ex parte Walker, 972 So.2d at 752.
As in Ex parte Walker and the eases on which it relied, the alleged error Woodward asserts is not obvious on the face of the record. The record is silent as to Woodward’s present claim that McCord had informed him that he was wanted by the authorities in connection with Officer Houts’s shooting and that this testimony would provide a noninculpatory explanation for his spontaneous statement to Parker. The transcript discloses only repeated statements from defense counsel that McCord would testify that Woodward had contacted her. Moreover, McCord would have been unable to testify whether Woodward had been unaware — prior to their conversation — that Montgomery authorities wanted to question him. That would have been information known only to Woodward, himself, and he did not testify at trial. Any testimony from McCord about what Woodward did or did not know before he telephoned her would have been pure speculation on her part. Woodward’s assertion of error is based on his current speculation about McCord’s testimony— that she would have testified that she informed him that the police suspected him in the shooting of Officer Houts — and speculation based on a silent record does not support a finding of plain error.
A finding of plain error is unwarranted for the additional reason that the record does not establish that the trial court’s alleged error adversely affected Woodward’s substantial rights.
Rule 401, Ala. R. Evid., provides:
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
Rule 402, Ala. R. Evid., provides:
“All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.”
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Woodward asserted at trial only that McCord would testify that she spoke to Woodward when he telephoned her. That testimony would have had no probative value on the jury’s determination of the issue whether Woodward had shot Officer Houts. McCord’s testimony that *1008 Woodward contacted her while he was en route to Atlanta would not have provided evidence, or even an inference, that Woodward became aware that he was wanted by the police only because McCord had told him so. To the contrary, a reasonable implication from McCord’s testimony would have been that Woodward contacted his defense attorney during his flight to Atlanta because he had shot Officer Houts. Because McCord’s testimony would not have made the existence of any fact of consequence more probable or less probable than it would be without the testimony, the testimony would have been irrelevant. Rule 402, Ala. R. Evid. Although this was not the trial court’s stated reason for refusing to allow McCord to testify, we can affirm a trial court’s ruling for a reason other than the stated one. See, e.g., Peralta v. State, 897 So.2d 1161, 1188 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004). Because the trial court could have refused to permit the testimony on the ground that it was irrelevant, we hold that the trial court’s judgment was due to be affirmed on this additional ground, and that this ground provides another reason that Woodward is not entitled to relief on his claim of error.
The Sixth Amendment does not empower a defendant to violate the rules of evidence. Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (“The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence.”). Contrary to Woodward’s assertion on appeal, he could have no “weighty interest” in the presentation of irrelevant testimony, and the trial court’s enforcement of the rules of evidence could not be considered arbitrary. Certainly Woodward had a Sixth Amendment right to present witnesses that were material and favorable to his defense. Taylor v. Singletary, 122 F.3d 1390 (1997). To establish materiality of excluded evidence, however, Woodward would have had to show that the “evidence [unavailable at trial] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” 122 F.3d at 1395, quoting Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Testimony from McCord that she told Woodward that the police were looking for him would not have put the case in a different light. Woodward told three people that he had shot a police officer during a traffic stop. Further, Woodward’s solicitation of the assistance of several people in his travels out of the city and then out of the state, his instruction to Cunningham to burn some of the clothing he had been wearing, and his instruction to another friend to dispose of Surles’s vehicle all indicated that he knew the police would be looking for him. His inability to present McCord’s testimony that she told him the Montgomery police were looking for him did not preclude him from putting on a defense or undermine confidence in the verdicts.
Even assuming that the record contained a proffer showing that McCord would have testified as Woodward alleges she would have, that is, even assuming Woodward established through an offer of proof that McCord would have testified that she told Woodward that he was being sought by the police, that testimony would not have rebutted the inference that Woodward’s statement to the arresting officer was based on guilty knowledge. That Woodward heard from McCord that he was wanted by the police does not eliminate or even diminish the inference that Woodward shot Officer Houts. As the trial court noted, testimony already received at trial from three State’s witnesses established that Woodward had told them earlier in the day that he had shot some *1009 one.[3] Thus, even if the record supported Woodward’s current claim, we would find no error, and certainly no plain error, in the trial court’s denial of his request to allow McCord to testify, because her testimony would have been irrelevant and immaterial and therefore not probative.
Finally, as McCord herself noted to the trial court when Woodward announced his intent to call her as a witness McCord had been unaware that she was a potential witness and she knew several of the jurors, who had not been asked during voir dire about their relationship with her and whether that would prevent them from being impartial jurors.
For all the foregoing reasons, Woodward is not entitled to relief on this claim of error.
II.
Woodward next argues that the trial court erred when it permitted Agent A1 Mattox, an investigator with the Alabama Bureau of Investigation (“the ABI”), to testify as an expert that he had viewed the video taken from Officer Houts’s patrol car and that he had determined that the assailant was a black male. Woodward argues that Agent Mattox’s identification of the race of the shooter was not appropriate expert testimony under Rule 702, Ala. R. Evid. The State argues that Agent Mat-tox gave both expert testimony and lay testimony and that his identification of the shooter as a black male constituted only lay testimony, and therefore was admissible pursuant to Rule 701, Ala. R. Evid.
Before the State presented Agent Mat-tox’s testimony, Woodward argued to the trial court that Agent Mattox had viewed an enhanced videotape from Officer Houts’s dashboard camera and that he should not be permitted to testify as to conclusions “which the jury [could] reach just as easily,” particularly that the shooter was a black male. (R. 1142.)[4] Woodward also stated, “What the evidence has established is [that the shooter was] dark-skinned from what we’ve heard already. And that video is not going to definitively determine that it’s a black male.” (R. 1142.) He argued that Agent Mattox would testify that he had enhanced the videotape from the patrol car and “ ‘this is what I eyeballed,’ ” and “[h]is ability to eyeball what’s on the video is not better than any other witness or any juror.” (R. 1144.) The trial court stated that the State could use Agent Mattox’s PowerPoint presentation to emphasize the points it was trying to make and that defense counsel could cross-examine Agent Mattox on whether the conclusions he drew from the video were valid. Woodward then requested that the trial court instruct the jury that it, and not Agent Mattox, was the finder of facts, and the trial court agreed to do so.
Agent Mattox then testified that he was a employed by the ABI in the Bomb Squad and Technical Services Unit. Agent Mattox stated that he was the supervisor of the Technical Services Unit and that he handled all the large-scale surveillance and was responsible for the enhancement of videos, that is, attempting to clear up videos so they could be seen. Agent Mattox testified about the training he received in video enhancement and about the techniques used to enhance videos. The State proffered Agent Mattox as an expert in video enhancement, and the trial court *1010 stated that Agent Mattox could offer his opinions as an expert. Agent Mattox testified that the in-car dashboard camera in Officer Houts’s patrol car had a videotape, and he downloaded the tape onto the computer hard drive of an Intergraph video-analyst system for storage and safekeeping, so that the original video was not damaged or destroyed. Agent Mattox said that the computer system made it possible to view the video frame by frame and provided for additional magnification and alteration of the light contrast for clarification of the images but that it did not alter the video itself. Agent Mattox had prepared a PowerPoint presentation of the video enhancement to assist him in his explanation to the jury. Woodward stated that he objected on the grounds he had stated before Agent Mattox testified, and the trial court instructed the jury as follows:
“Ladies and gentlemen, let me tell you this: The PowerPoint presentation in and of itself, that’s not evidence. That’s just something the prosecution is offering into evidence to help them make certain points to you. Just because the PowerPoint presentation says one thing, that doesn’t mean that you have to agree to it. And the State still has its burden of proof to prove to you what they say the tape shows. And you’re not bound by any witness’s conclusion as to what the State — what the tape — shows. You, certainly, can rely on your own independent evaluation and review of the tape. And you can draw whatever conclusions you want to draw from that tape. In other words, you don’t have to go with what they say the tape says. Rely on it based on your own observation.”
(R. 1196-97.)
Following the trial court’s instruction about the PowerPoint presentation, defense counsel stated, “Thank you, Your Honor.” (R. 1197.)
Agent Mattox then testified that the Montgomery Police Department had requested that he attempt to determine several pieces of information from the videotape: the tag number of the vehicle; the make, model, year, and color of the vehicle; the identity of the person inside the vehicle; whether the gun was fired with the shooter’s right hand or left hand; the make, model, and caliber of the weapon used in the shooting; the number of shots fired; the duration of the shooting; the trajectory of the shell casings; the color of the shell casings; and any actions Officer Houts took as he approached the vehicle.
Agent Mattox testified that he was able to determine the tag number on the vehicle and that the vehicle was a Chevrolet; he could not determine the make or model of the car. Agent Mattox said that the driver of the vehicle was the shooter and that he had fired the gun with his right hand. Agent Mattox found no evidence to indicate that there was a second occupant in the vehicle. Agent Mattox said he was able to conclude that the shooter was a black male. Agent Mattox determined that the driver had fired a large-frame, semiautomatic pistol, but he could not determine the make, model, or caliber of the weapon. He was able to determine that five shots were fired, and the shots had been fired in 2.89 seconds. Finally, Agent Mattox testified, “I concluded — and you can see from the video — that [Officer Houts] never took any actions that would have been in response to any type of threat he perceived from ... inside the vehicle.” (R. 1204.)
Woodward argues that the trial court erred when it permitted Agent Mattox to offer his expert opinion that the shooter was a black male. Woodward argues that Agent Mattox claimed to base his identifi *1011 cation on the shooter’s “mannerisms, movement, character traits [and] physical traits” (R. 1220), and that this identification was not a proper subject for expert opinion and, even if it was, Agent Mattox was not qualified as an expert to make a racial identification. “Mattox’s testimony amounted to little more than an assertion that because the assailant shot a police officer, he must have been a black male,” and the testimony violated Woodward’s rights under the Equal Protection and Due Process Clauses of the United States Constitution. (Woodward’s brief, at p. 28.) Although Woodward objected at trial before Agent Mattox testified and argued that Agent Mattox’s ability to draw conclusions from the enhanced video was no better than the jury’s, he now argues for the first time that Agent Mattox’s testimony was racially discriminatory and that it violated his rights to due process and equal protection. Because Woodward objects on grounds not raised at trial, we review that portion of the claim for plain error only.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1098, 1103 (Ala.2000). Rule 702, Ala. R. Evid., provides: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”[5] Thus, the focus of the rule is not whether the subject matter of the testimony is within the common knowledge or understanding of the jurors, but whether the expert’s opinion or testimony will assist the trier of fact in understanding the evidence or deciding an issue of fact. The State offered Agent Mattox as an expert in video enhancement, and Agent Mattox testified as to the process he used to enhance the videotape from Officer Houts’s patrol car; he testified about the photographs and the enhanced video he prepared during that process; and he testified about the conclusions and observations he made as a result of that process. Agent Mattox was not testifying as a racial-identification expert. Agent Mattox’s testimony about his conclusions regarding the race of the person who shot Officer Houts is no different than the testimony about any of the other conclusions he reached as a result of the enhancement of the video and his repeated viewing of the enhanced video and the photographs he made from the video. All of Agent Mattox’s opinions were offered to assist the triers of fact in understanding the evidence or in determining issues of fact and were, therefore, permissible. For example, Agent Mattox testified about the license tag number of the vehicle, about the number of shots fired and the direction in which the casings were ejected, about the color of the casings, and that the shooter was right-handed. Although the jury, too, would have been able to (and did) “eyeball” the enhanced video and the photographs to make those determinations, Woodward does not now argue — and we would not find — that the trial court abused its discretion when it permitted Agent Mattox to testify about the details he observed and about his conclusions on these matters because, we conclude, Agent Mattox’s testimony assisted the jury in understanding the evidence or in determining a fact in issue. Woodward also does not argue on *1012 appeal that the trial court erred when it permitted Agent Mattox to testify as to the make of the vehicle, even though Agent Mattox was not qualified as an expert in vehicle identification; nor does Woodward argue that the trial court abused its discretion when it permitted Agent Mattox to testify about the type of gun used in the shooting, even though Agent Mattox was not proffered as a weapons expert; nor does Woodward argue that the trial court abused its discretion when it permitted Agent Mattox to testify that Officer Houts’s actions did not indicate that he was responding to any type of threat he perceived from anyone in the vehicle, even though Agent Mattox was not an expert in human behavior or psychology. Even if Woodward had made those arguments, we would conclude that there had been no abuse of discretion in the admission of that testimony because it, too, helped the jury to understand the evidence or to determine a fact in issue. The same is true of Agent Mattox’s testimony as to his opinion about the race of the shooter. That testimony was based on Agent Mattox’s repeated viewings of the digitized and enhanced video, as was the testimony about all the other conclusions and opinions he gave at trial. There is no indication from the record that testimony about the race of the assailant was offered or used by the prosecution to inflame the jury or to cause undue prejudice based on race, or for a purpose other than any of the remainder of Agent Mattox’s testimony. All the testimony was offered to assist the jury in understanding the evidence or to determine a fact in issue.
Furthermore, it is important to note that on cross-examination Woodward vigorously challenged Agent Mattox’s opinion that the assailant was a black male, and he challenged other conclusions Agent Mattox reached, including whether the assailant was alone in the vehicle. (R. 1216-20.)
Finally, the trial court emphatically instructed the jury that it was the ultimate finder of fact and that the jury was not bound by Agent Mattox’s opinions about what the videotape showed. Jurors are presumed to follow the trial court’s instructions. See, e.g., Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (“[A]n appellate court ‘presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.’ ” (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))). Nothing in the record in this case indicates that the jury did not follow the trial court’s instruction.
Thus, we find no abuse of discretion or error in the admission of Agent Mattox’s testimony and certainly no violation of equal-protection or due-process rights as Woodward has belatedly argued. The record does not contain even an inference, much less evidence, supporting Woodward’s claim that the State engaged in any form of racial bias or discrimination when it presented Agent Mattox’s testimony.
Finally, even if the trial court erred when it permitted Agent Mattox’s testimony about the race of the driver of the Impala, the error would have been harmless because eyewitnesses had already testified that the driver was a black man. Rule 45A, Ala. R.App. P.
III.
Woodward next argues that the trial court committed several errors related to the State’s presentation of testimony and demonstrative evidence about cellular-telephone calls he allegedly made near the time of Officer Houts’s murder.
Pete DeLeon, a custodian of records at Alltel Wireless, testified about call records, including cell-tower information, for three different accounts. Woodward had two ac *1013 counts, but the records indicated that Tiffany Surles was the user of the cell phone associated with one of Woodward’s accounts. The third record DeLeon testified about was Wendy Walker’s. DeLeon identified two maps: one map contained only the location for Alltel’s cell towers and that map was created by engineers; DeLeon testified that he created a second map that showed the location of the cell towers that were “hit” from Woodward’s cell phone on the day of the shooting. The locations of the cell towers were consistent with Woodward’s being in the area where witness Shirley Porterfield had testified she had seen him on the morning of the shooting, driving a light-colored Impala. DeLeon testified that Alltel records did not permit even a radio-frequency (“RF”) engineer to pinpoint the exact location of the person using the cell phone; the records only provided information about the cell towers that were used during a call.
Jennifer Scheid, a custodian of records for Sprint Nextel, testified about call records, including cell-tower information, for three accounts: one account was a prepaid phone; one subscriber was Paul Lewis but the registered user’s name on that account was Joe and was consistent with being used by Joseph Pringle; and the final account was Brittne Deramus’s. She said the records were the type kept in the ordinary course of business for Sprint Nextel. Scheid testified without objection that State’s Exhibit 68 consisted of maps displaying the locations of Sprint Nextel’s cell-phone towers, based on the latitude and longitude readings in the company’s database. She stated that the maps fairly and accurately represented the cell-site locations of Sprint Nextel, and that they would aid in her explanation to the jury about the calls made on the day of the murder. The maps were admitted without objection.
Scheid testified without objection that one of the records displayed outgoing phone calls from the prepaid phone at 12:86 p.m. and again at 12:38 p.m. to a number that other evidence established was Tiffany Surles’s cell-phone number. Those calls were placed using the tower located in downtown Montgomery, Scheid testified — again without objection from Woodward. Scheid testified about phone calls made from the prepaid phone that afternoon, one of which went through a tower located on 1-65 north of Montgomery and another used a tower located in Atlanta, Georgia. Additional testimony was received about other calls made that day; some of the calls went through a tower that was close to Century Plaza mall in Birmingham.
After Scheid testified that one of the calls went through a tower located on Interstate 65 the prosecutor asked her whether the cell phone customer had been traveling north on the interstate at the time. Defense counsel objected that the question was beyond Scheid’s expertise, and he said, “They can talk about towers where the cell phone went through but not the physical location of any person making the call, improper foundation predicate.” (R. 1159.) The State withdrew the question. The State later pointed at a cellphone tower on one of the maps and asked Scheid, “If there had been testimony saying that this phone had been used going up 1-65, would that be consistent with an individual being close to this cell-phone tower?” (R. 1160-61.) Defense counsel objected on the ground that the witness was limited to testifying about which towers were used during certain calls, and the trial court overruled that objection.
On cross-examination defense counsel stated to Scheid that she had “some level of expertise, obviously, to cell phones and towers and that kind of thing,” and Scheid *1014 agreed. (R. 1165.) Defense counsel then stated to Scheid that she was not an “RF engineer,” and Scheid agreed, then testified that an RF engineer is someone who works with the actual towers. Scheid further agreed when defense counsel said that an RF engineer typically comes in to determine the actual location of a person making a phone call, and when he further stated to the witness, “And that’s why you were only able to tell the jury about what towers were used but not, basically, where the person was, the approximate area where the calls originated from?” (R. 1166.) Defense counsel then asked Scheid a series of questions about the configurations of cell-phone towers and she answered those questions, but when defense counsel asked about the configurations of the antennas on the cell-phone towers, Scheid testified that an engineer would know that information. Scheid testified that her company’s cell-phone towers have two or three “sectors,” which she said “refers to which side of the tower the call was hitting off of.” (R. 1169.) Scheid was able to identify from the records admitted into evidence which sector a call had been routed through; however, she also testified that an RF engineer might be able to better determine the location of a caller by knowing which sector a call used. Woodward provided Scheid with a map he had created, and it purported to represent calls made from Woodward’s phone on the day of the murder. When the State objected to Woodward’s use of the map because he had not laid a proper foundation for it, Woodward argued that Scheid was well qualified to answer some questions from the map, “considering all the maps she’s been looking at that [were] just like this.” (R. 1172.) Woodward also stated, “And, Judge, the sector layout isn’t crucial to the testimony. It just helps — enables—her to explain — ” (R. 1178.) After reviewing the records from Sprint Nextel that had been admitted into evidence Scheid then stated that the 12:36 p.m. phone call from Woodward’s phone came from a different sector than did the 12:38 p.m. call he made.
Scheid testified on cross-examination that a cell-phone call usually is routed through the closest tower with the strongest signal, but that if there was a problem with the closest tower or if a tower was at maximum capacity, the cell-phone handset would then use another nearby tower or the tower providing the next strongest signal.
Woodward raises three claims regarding this evidence, and we address each in turn.
A. Woodward first argues: “Because the State did not present live testimony from the engineers who created the cell phone records and maps, the trial court erred in admitting the records and maps.” (Woodward’s brief, at p. 45.) He asserts that the State’s presentation of the cell-phone evidence through the testimony of the custodians of the records violated his Sixth Amendment right to confront and cross-examine witnesses who had knowledge of the records and maps or the risk of error associated with them. He cites Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Woodward did not raise this objection at trial, so we review it now only for plain error. A trial court has wide discretion in determining whether to exclude or to admit evidence, and the trial court’s determination on the admissibility of evidence will not be reversed in the absence of an abuse of that discretion. See, e.g., Hudson v. State, 85 So.3d 468 (Ala.Crim.App.2011). We find no abuse of discretion in the trial court’s admission of the evidence; therefore, we find no plain error.
The United States Supreme Court in Melendez-Diaz held that the Sixth *1015 Amendment generally prohibits the introduction of a forensic-laboratory report that was created specifically to serve as evidence in a criminal proceeding if the defense has no opportunity to cross-examine the person who made the report. For the reasons explained below, Melendez-Diaz does not support Woodward’s allegation of error.
First, DeLeon of Alltel testified on cross-examination that he created the map that displayed each call made and the tower through which the call was routed. “The actual call records indicate the exact tower that the call went through,” DeLeon said. (R. 1133.) DeLeon answered affirmatively when Woodward asked during cross-examination, “[Y]ou don’t have to be an engineer to do that part, right?” (R. 1131.) The map used at Woodward’s trial that displayed the calls made and the location of the towers was not generated by an engineer. Furthermore, DeLeon testified that he had identified which cell-phone tower each call went through, but that he was not testifying about the exact location of the person holding the cell phone when the call was made. When Woodward queried whether an RF engineer would be required to give an expert opinion on the exact location of the person making the phone call, DeLeon stated, “No. The Alltel system does not allow an exact pinpointing — ” (R. 1132.) Therefore, as the State correctly argues, there is no basis in the record for Woodward to now argue that the Alltel maps were created by an engineer and that he was denied his Sixth Amendment right to question someone knowledgeable about the maps.
Second, as to Scheid’s testimony about the Sprint Nextel records and maps, the only relevant testimony in the record about the creation of the maps is that the records from which they were generated were kept in the ordinary course of business and that they accurately reflected the locations of all Sprint Nextel cell towers throughout the United States. Seheid, too, testified only about the cell-phone towers that routed calls from certain phones relevant to Woodward’s phone calls on the day of the murder. Defense counsel stated on more than one occasion during trial that Seheid was qualified to give information about the location of the cell-phone towers the calls went through. Woodward’s argument on appeal — that he was denied his constitutional right to cross-examine the witnesses who generated the maps — was not timely raised, is contrary to the position he took at trial, and is not supported by the record.
We are aware of the United States Supreme Court’s recent decision in Bullcoming v. New Mexico, 564 U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). The United States Supreme Court held that the Sixth Amendment does not permit the prosecution to introduce a forensic-laboratory report as evidence in a criminal proceeding through the in-court testimony of a scientist who did not perform or observe the performance of the test or who did not sign the certification of the results. The accused has the right to be confronted at trial by the analyst who certified the test results unless that analyst is unavailable at trial and the accused had an opportunity to cross-examine him pretrial, the Court held. That case has no application here, either, for the same reasons discussed with regard to Melendez-Diaz. Bullcoming is distinguishable in that one of the records custodians who testified at Woodward’s trial had created the map showing the towers used to route the relevant phone calls and the other used the call records in court to demonstrate the location of the tower based on data from the call records. Woodward cross-examined both witnesses extensively regarding the scope and limits of their testimony, making it clear that *1016 neither witness was testifying about Woodward’s precise location during any of the calls. Therefore, there was no violation of Woodward’s Sixth Amendment right of confrontation. No error, and certainly no plain error, occurred.
B. In a related argument, Woodward argues that the trial court erred when it permitted DeLeon and Scheid— both lay witnesses — to offer their opinions as to the meaning of the cell-phone records and maps, rather than testifying about matters within their personal knowledge. Specifically, he argues that DeLeon and Scheid were erroneously permitted to testify that the cell-phone records indicated the locations of the callers at certain times. Woodward cites only two pages of the transcript in this portion of his argument. The State correctly notes that Woodward did not raise this objection during any of DeLeon’s testimony; thus, as to his testimony, we review this claim for plain error. Woodward did object during Scheid’s testimony, when the prosecutor asked whether, if there had been testimony that Woodward’s phone had been used as he traveled on Interstate 65, would that be consistent with the caller being close to a certain cellphone tower. (R. 1160-61.) Woodward then argued that Scheid was not qualified to testify about the area the phone was used from, and he argued that an expert’s opinion was required to answer that question. We review the trial court’s adverse ruling on Woodward’s objection to Scheid’s testimony for an abuse of discretion. See Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). We find no plain error in any of DeLeon’s testimony or Scheid’s testimony, and we find no abuse of the trial court’s discretion in its ruling on Woodward’s objection to Scheid’s testimony.
Rule 701, Ala. R. Evid., provides:
“If a witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
Rule 702, Ala. R. Evid.,[6] provides:
“If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.”
Although our research has disclosed no Alabama case that addresses this issue, the Tennessee Court of Criminal Appeals addressed a similar issue in dicta when a defendant argued that the trial court had erred in permitting a detective to testify as an expert regarding cell-phone towers. State v. Hayes, (No. M2008-02689-CCA-R3-CD, Dec. 23, 2010) (Tenn.Crim.App.2010) (not published in S.W.3d). The Tennessee Court of Criminal Appeals rejected the argument, stating:
“The detective merely testified that he saw the locations of the cell phone towers listed on the cell phone records and plotted those locations on a map. He inferred that the defendant traveled near those towers. Detective Fitzgerald explicitly stated that he was not an expert in how the cell phone towers worked. We conclude that a layperson could plot the locations of the towers on a map and draw the same inference; therefore, his testimony did not require specialized knowledge as contemplated by Tennessee Rule of Evidence 702, which governs expert testimony, and the *1017 trial court did not err by allowing the testimony.”[7]
We agree with the Tennessee court’s analysis, and we adopt it here. DeLeon and Scheid testified based on their review of the records of the cell-phone company each worked for as a records custodian and based on their personal knowledge of the manner in which those records are generated and recorded. Neither De-Leon’s nor Scheid’s testimony required specialized knowledge. The testimony was offered to assist the jury to reach a clear understanding of the witness’s testimony or to determine a fact in issue, and was thus properly offered as lay-witness testimony. Furthermore, the State did not offer the witnesses as experts, and the trial court, therefore, did not accept them as experts. Moreover, Woodward cross-examined each witness, and established through his cross-examination that each witness was able to explain to the jury which cell-phone tower a call went through when the call was made but was not able to give the exact location of the caller when the call was made. (R. 1181-38, 1166.)
The witnesses did not testify about the exact location of the caller at any time during their testimony, contrary to Woodward’s assertion on appeal. In fact, De-Leon testified that Alltel was not able to pinpoint the location of a user based on cell-tower information. We hold that the trial court did not abuse its discretion or commit plain error when it permitted the witnesses to testify about the cell phone records and cell towers used during certain phone calls. Woodward is not entitled to any relief on this claim of error.
C. Woodward next argues that the trial court abused its discretion when it denied his motion for a continuance to procure the services of an RF expert. Woodward argues that the testimony of an RF engineer would have rebutted the State’s argument and would have demonstrated that he was not at the crime scene when Officer Houts was shot.
““‘[I]n Alabama, our courts have always held it is discretionary with the trial court whether it should halt or suspend the trial to enable a party to secure or produce witness in court.... And, in the exercise of that discretion the trial court is not to be reversed save for gross abuse of discretion.” Alonzo v. State ex rel. Booth, 283 Ala. 607, 610, 219 So.2d 858, 861 (1969). In Ex parte Saranthus, 501 So.2d 1256 (Ala.1986), the Alabama Supreme Court addressed the issue of a pretrial continuance:
“ ‘ “A motion for a continuance is addressed to the discretion of the court and the court’s ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).”
*1018 “ ‘Saranthus, 501 So.2d at 1257. “ ‘There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.’ Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).” Glass v. State, 557 So.2d 845, 848 (Ala.Cr.App.1990).
“ ‘ “The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires ‘a positive demonstration of abuse of judicial discretion.’ Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).” Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.1979). A “positive demonstration of abuse of judicial discretion” is required even where the refusal to grant the continuance is “somewhat harsh” and this Court does not “condone like conduct in future similar circumstances.” Hays v. State, 518 So.2d 749, 759 (Ala.Cr.App.1985), affirmed in part, reversed on other grounds, 518 So.2d 768 (Ala.1986).’
“McGlown v. State, 598 So.2d 1027, 1028-29 (Ala.Crim.App.1992).
“ ‘ “Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burdens counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances.” ’
“Price v. State, 725 So.2d 1003, 1061 (Ala.Crim.App.1997), quoting Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). See also Sullivan v. State, 939 So.2d 58, 66 (Ala.Crim.App.2006) (‘ “As a general rule, continuances are not favored,” In re R.F., 656 So.2d 1237, 1238 (Ala.Civ.App.1995), and “[o]nly rarely will [an] appellate court find an abuse of discretion” in the denial of a motion for a continuance.’).”
Gobble v. State, 104 So.3d 920, 940 (Ala.Crim.App.2010).
Viewing the circumstances of this case, discussed below, with the foregoing guidelines in mind, we hold that the trial court did not abuse its discretion when it denied Woodward’s mid-trial motion for a continuance. Woodward did not satisfy any of the three requirements for a continuance.
1. First, Woodward failed to establish that the testimony would have been material. Woodward argued that he needed the services of an RF expert who would testify that the 12:36 p.m. phone call he placed to Surles approximately two minutes after the murder “hit” sector three of the cell tower, while sector one was the sector of the tower closest to where the shooting occurred. This testimony would not have been material because the State did not present testimony about which sector of the cell tower the phone call hit. The State’s witness testified only that the call went through the tower near the crime scene. Testimony by a defense expert about which sector of the cell tower the call hit two minutes after the murder occurred would not have rebutted any evidence the State admitted about the phone call. Rather, because the phone call was placed approximately two minutes after the murder, the testimony Woodward argued he needed to present would have, in fact, provided additional evidence that he was in the area where the shooting oc *1019 curred within minutes after the shooting. Importantly, the State did not present evidence about Woodward’s precise path in the moments after he left the scene of the shooting. As the State correctly argues, the testimony Woodward argues he should have been allowed to present would not have contradicted the State’s testimony about the phone call or his general location immediately after the shooting. The trial court recognized that the evidence would not have been material. In response to Woodward’s argument in support of the motion to continue the trial court stated that Woodward had “more than established” that the testimony about a cell tower being hit did not pinpoint the caller’s exact location; the court said: “I think everybody understands all it does is put you in an area. You’re not going to hit a cell tower in downtown Montgomery [if] you’re calling from Birmingham or you’re calling from East Montgomery .... I think we all got that.” (R. 1229-30.)
As to the competence of the evidence, nothing in the record indicates that a witness Woodward might present would not be competent to testify about the sector of the cell phone tower hit during the call. However, Woodward’s failure to establish that the evidence was material means that he has failed to establish the first requirement he needed to establish in order to support his motion for a continuance.
2. Woodward also failed to establish that there was a probability that the testimony would have been forthcoming if the trial court had continued the case. During the hearing on the motion to continue, which was held on a Friday afternoon during the trial, on August 22, 2008, the trial court asked whether Woodward had an expert “here, ready to go right now?” (R. 1226.) Woodward replied, ‘We don’t have one.” (R. 1226.) Woodward further explained “But we figured, we would be able to get it out of [the State’s witness] at cross-examination. But we were unable to obtain our own because of the very, very short time, the time the Court had granted that approval for funds.” (R. 1226.) Woodward then stated that the defense had to request a continuance “to be able to obtain that person.” (R. 1227.) Woodward then stated that after the trial court filed a written order granting funds to hire the cell phone experts, he “made calls to the appropriate people that can arrange and coordinate one for us.” (R. 1227.) Woodward said he had been unable to obtain the services of an expert between the Thursday afternoon the court granted the motion for funds and the following week of trial. The trial court then asked, “So are you representing to me that there’s somebody whose ready to come in next week and testify?” (R. 1227.) Woodward then stated that “Mr. Pitts” — who is otherwise unidentified in the record— would be able to testify about the sector information. Defense counsel further stated: “The State’s witness, I believe, would be able to get — Any RF engineer would be able to testify to the fact that sector — what sector — three means.” (R. 1227.) Finally, Woodward stated that he had spoken to another records custodian at Sprint Nextel who knew what the sector data meant, and he then requested either a continuance “to get him here or move to exclude the evidence on the cell towers.” (R. 1228.)
The record does not disclose a probability that the evidence would have been forthcoming if the trial court had granted a continuance. Woodward informed the trial court that he had attempted before trial to obtain the services of an RF expert but had been unable to do so in the time available. His argument on appeal that if the trial court had given him “slightly more time, it [was] very likely” that he could have obtained the services of an RF expert, Woodward’s brief, at p. 53, is not *1020 reasonable, based on Woodward’s allegations about his failed attempts before trial to obtain the services of an RF expert.
The State acknowledged at trial, however, that Woodward had spoken to Mr. Pitts and could have subpoenaed him, that he had spoken to experts at Sprint Nextel, and that a jury member was an RF engineer “[s]o they’re not that hard to locate.” (R. 1228.) Even if Woodward had established this requirement and had established that it was probable that the evidence would have been forthcoming, his failure to establish the remaining requirements would have warranted the trial court’s denial of his request for a continuance.
3. Finally, in order to prove to a trial court that he is entitled to a continuance because of the absence of a witness the moving party must have exercised due diligence to secure the presence of the witness. Woodward did not exercise due diligence. Woodward argues on appeal that the trial court had failed to grant his motion for funds to retain an RF expert until three business days before trial. He also argued when he made his motion to continue that he had initiated his attempts to obtain the services of an RF engineer after he received the trial court’s written order granting him funds to retain an expert a few days earlier. However, as the State correctly argues on appeal and as it pointed out to the trial court when Woodward moved for a continuance, the trial court had orally granted Woodward’s motion for funds weeks before trial, and Woodward could have sought and retained an expert during that time.
A pretrial hearing was held on July 7, 2008, and during a discussion about whether the State was going to present testimony from a cell-phone expert Woodward made a motion for funds to employ a cellphone expert. The trial court granted the motion. That Woodward had planned at that time to hire a cell-phone expert is also reflected in the transcript of a telephone call Woodward made from the county jail that same day.[8] Woodward told his father during that call that his attorneys told him that they were going to get a “cell-phone specialist” who would attempt to determine his location when certain calls were made. Thus, Woodward’s representation at trial, on August 22, 2008, that he had had very little time to attempt to hire an expert was inaccurate, at best.
For all the foregoing reasons, we find no abuse of discretion in the trial court’s refusal to halt or to suspend the trial to enable Woodward to attempt to secure or produce an expert witness. Woodward failed to meet any of the three requirements necessary to establish that he was entitled to a continuance, and he is not entitled to relief on appeal as to this issue.
IV.
Woodward next argues that the trial court erred when it allowed Officer Houts’s widow, Ashley Houts, to testify extensively about her husband’s background and his character and about her last moments with her husband before he died. Woodward contends that Ashley’s testimony was improper victim-impact testimony that is prohibited during the guilt phase of a capital trial. Woodward did not raise this objection during Ashley’s testimony, and he acknowledges that this claim must be reviewed for plain error.
“Although the failure to object will not preclude [plain-error] review, it will weigh against any claim of prejudice.” *1021 Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
The Alabama Supreme Court has held that victim-impact statements
“are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible. See C. Gamble, McElroy’s Alabama Evidence § 21.01 (4th ed.1991), citing, inter alia, Fincher v. State, 58 Ala. 215 (1877) (a fact that is incapable of affording any reasonable inference in reference to a material fact or inquiry involved in the issue cannot be given in evidence). If the statements are not material and relevant, they are not admissible.”
Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993).
“[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.” Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). The Court in Ex parte Rieber also said:
“However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.”
663 So.2d at 1005.
First, much of Ashley’s testimony was not victim-impact evidence. She explained that Officer Houts was working overtime on the day he was shot; that he always telephoned her halfway through his shift but that he did not call her that day and she later found out that he had not called her because he had been shot; that she went to the hospital to be with him after he was shot and that he never regained consciousness; and that he died two days after he was shot. Ashley also identified an autopsy photograph of Officer Houts to identify him. The foregoing testimony was relevant to prove the circumstances leading up to the crime and to Officer Houts’s death days later, and it was relevant to identify Officer Houts as the victim of the shooting. That testimony was properly admitted. See, e.g., Stanley v. State, [Ms. CR-06-2236, April 29, 2011] — So.3d - (Ala.Crim.App.2011).
We agree with Woodward, however, that some of Ashley’s testimony was not relevant to any issue in the case and, therefore, was inadmissible. For example, the State elicited testimony that Ashley and Officer Houts met while they were both in the military and stationed overseas; that Officer Houts had recently purchased an exercise machine and that before he left for work on the morning he was shot he had joked with Ashley about her putting the machine together; and that Officer Houts donated plasma on a regular basis and that he and Ashley both had a policy to give of themselves to others. Although this testimony the State elicited from Ashley was irrelevant, having examined the record in its entirety, we conclude that the *1022 irrelevant portions of Ashley’s testimony did not operate to deny Woodward a fair trial or otherwise prejudice a substantial right of Woodward’s.
The jury was instructed that it could not find Woodward guilty unless the State proved his guilt beyond a reasonable doubt. The jury was also instructed not to allow prejudice, sympathy, or emotion to affect its verdict. We note, as the Alabama Supreme Court did in Ex parte Rieber:
“It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Woodward] did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [Officer Houts] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).”
663 So.2d at 1006.
Although some of Ashley’s testimony was irrelevant, we find that it did not affect the outcome of the trial, that it did not prejudice Woodward’s substantial rights, and that allowing it did not rise to the level of plain error. Woodward is due no relief on this claim.
V.
Woodward next argues that the trial court erred when it permitted Tiffany Surles to testify that Woodward was in possession of her car on the morning of the shooting. He says that Surles did not have personal knowledge of that fact, and that her testimony was prejudicial because it went directly to the crucial question of whether Woodward was driving her car on the day of the shooting.
Surles testified that during the evening of September 27, 2006, she and her mother went to church. Surles said she and Woodward argued when she returned home because he was supposed to have gone to church with her but had wanted to do something else that night. Surles said that “one thing led to another,” and Woodward left their apartment for a while, but returned and spent the night there. Surles said that on the morning of September 28, 2006, while she was in the shower, Woodward left the apartment. Surles said that Woodward had had the keys to her Chevrolet Impala on the previous evening, and that when he left that morning, she did not have the keys and Woodward did not leave the keys.
Surles testified that she telephoned Wendy Walker and asked Walker to help her move her belongings from the apartment she shared with Woodward. Surles testified that they used Walker’s car to move the belongings because Surles did not have her own car at the time. The prosecutor asked Surles where her car was, and she stated, “I guess Mario had it.” (R. 851.) Woodward objected and stated: “She doesn’t know.” (R. 851.) The trial court overruled the objection. Woodward did not move to strike Surles’s answer.
Woodward’s objection was untimely, and it failed to preserve this issue for review. See, e.g., Roper v. State, 695 So.2d 244, 246 (Ala.Crim.App.1996) (“ ‘An objection to a question, made after an answer is given, is not timely and will not preserve the issue for review.’” (quoting Scott v. State, 624 So.2d 230, 234 (Ala.Crim.App.1993))); and Chambers v. State, 356 So.2d 767, 768 (Ala.Crim.App.1978) (“The general rule is, that, after a question is asked, *1023 and a responsive answer given, an objection comes too late, and the trial court will not be put in error in the absence of a motion to exclude or strike, and also an adverse ruling on the motion”)- Therefore, our review of Woodward’s argument that the trial court erred when it permitted Surles to testify that she “guessed” Woodward had her car on the morning of the murder is for plain error only. Rule 45A, Ala. R.App. P.
“A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness’s own testimony.” Rule 602, Ala. R. Evid. “It is also well settled that a witness can testify to his beliefs, thoughts, or impressions where he had the opportunity to observe. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979).” Sheridan v. State, 591 So.2d 129, 133 (Ala.Crim.App.1991). See also W. Schroeder and J. Hoffman, Alabama Evidence, § 6.9 (3d ed.2006) (a witness who had an opportunity to observe the facts about which he testifies may testify “even if his testimony is phrased in such terms as T think’ or T believe.’ However, a witness may not engage in pure speculation [and a] witness may testify to his own beliefs, thoughts or impressions if they are based on his own knowledge.”) (footnotes omitted).
Rule 701, Ala. R. Evid., provides:
“If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
The Advisory Committee’s Notes to Rule 701 provide, in relevant part:
“Traditional common law, including that in Alabama, generally has precluded a lay witness from giving an opinion. The law has required that the witness place all the facts before the trier of fact, thus placing the trier of fact in just as good a position as the witness to draw a conclusion in the matter. Indeed, it has been said that permitting a lay witness to give an opinion preempts the role assigned to the jurors. Boatwright v. State, 351 So.2d 1366 (Ala.1977); C. Gamble, McElroy’s Alabama Evidence § 127.01(2) (4th ed.1991).
“The rule excluding opinion evidence has been under consistent attack through the years. Professor Morgan argued that it merely furnishes the basis for both foolish appeals and foolish reversals. E. Morgan, Basic Problems of Evidence 220 (1963). Dean Wigmore argued for its total abolition. 7 J. Wig-more, Wigmore on Evidence § 1929 (Chadbourn rev.1978). Criticism of this rule finally led to Fed.R.Evid. 701, which vests the trial court with discretion to permit lay witnesses to give opinions but only under certain conditions.
“Alabama Rule of Evidence 701, like its identical counterpart under the Federal Rules of Evidence, permits lay witnesses to give opinions whenever two conditions are met. First, the opinion must be rationally based upon the perception of the witness. This is no more than a restatement of the ‘firsthand knowledge rule,’ found in Ala. R. Evid. 602, tailored to opinions. No lay witness may give an opinion based upon facts that the witness did not personally observe. Second, a lay witness with firsthand knowledge may give an opinion only if it is helpful to a clear understanding of the witness’s testimony or to the determination of a fact in issue. A fair *1024 amount of discretion is vested in the trial judge regarding the determination of whether opinions are helpful. It is clear, however, that opinions should be excluded as not being helpful if they are ‘meaningless assertions which amount to little more than choosing up sides.’ Fed.R.Evid. 701 advisory committee’s note.”
Rule 701, Ala. R. Evid., Advisory Committee’s Notes.
Surles testified, essentially, that she was inferring that Woodward took her keys and her car on the morning of the murder. Her testimony was rationally based on her firsthand knowledge that Woodward had used her car the night before and he kept the keys thereafter, that he had left their apartment the following morning, and that her car was not available when she wanted to move her belongings from their apartment. Her testimony regarding her inference was helpful to the jury’s determination of a fact in issue, that is, whether Woodward was driving Surles’s vehicle later that day when Officer Houts stopped the Impala. No plain error occurred as the result of Surles’s testimony.
The trial court has substantial discretion in determining the admissibility of evidence, and its ruling on the admissibility of evidence will be reversed only when there has been a clear showing of an abuse of that discretion. See, e.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Even if Woodward had preserved this issue for appellate review, we would have found no abuse in the trial court’s discretion in the admission of the testimony here. Woodward is not entitled to any relief on this claim of error.
VI.
Woodward next argues that the trial court erred when it admitted into evidence the videotape from the dashboard camera in Officer Houts’s patrol car and that it erred when it admitted the enhanced version of that video. He argues that the State failed to authenticate the videotapes and to establish that they accurately reproduced the events that occurred or that the videotapes had not been altered. We disagree.
Agent Chris Gruhn with the Alabama State Police testified that at the time of Officer Houts’s murder he was a detective with the Montgomery Police Department. He and his partner responded to the call that an officer had been shot, and they were the first officers at the scene of the shooting. Agent Gruhn stayed with Officer Houts until the paramedics arrived and prepared to transport Officer Houts to the hospital. At that time, another officer, Sergeant Simmons, had arrived at the scene and mentioned the in-car video camera, and Agent Gruhn said that he went to Houts’s patrol car and viewed the video recorded by the in-car dash camera.
Agent Gruhn testified about the camera system in patrol cars:
“Inside the patrol cars, they have a MDT. What that is, is a Mobile Data Terminal. It’s a laptop that’s mounted in the vehicle. And with that, officers can utilize that when they stop a vehicle or run a driver’s license. They can get real-time information that is available within the system, driver’s license, registration, that sort of thing.”
(R. 814.)
Agent Gruhn identified photographs of the mobile data terminal (“MDT”) in Officer Houts’s vehicle and of the screen of that MDT — depicting the license tag data that was on the screen when officers arrived after the shooting. He testified that the MDT was hardwired into the vehicle and was “pretty standard in Montgomery *1025 Police Department patrol vehicles.” (R. 816.) Agent Gruhn was asked to explain further how the video system in the patrol cars operated, and he testified:
“They’re quite simple. Inside of the patrol car there’s a viewing monitor over the rear-view mirror. The actual recorder is in the trunk. And in this case, it’s a VHS recorder. And the camera is mounted. And it comes out through the windshield. And it’s basically, just a three-piece, portable, VHS camera, a little bit more modern. But it all operates off of its internal system of the car’s power.”
(R. 818.)
Agent Gruhn testified that the video can be played back on the display monitor, like a VCR. He further stated that Officer Simmons operated the video, announced that the video was playing, and that is when Agent Gruhn went to the patrol car to view the video with Officer Simmons. Agent Gruhn identified State’s Exhibit 16 as the videotape collected from Houts’s vehicle. He said that he had viewed the video in Officer Houts’s vehicle on the day of the shooting, that he had reviewed it again since that day, and that it was a fair and accurate representation of the videotape he had viewed on the day of the shooting.
Kevin Murphy testified that he was the Deputy Chief of Police for the Montgomery Police Department and that he had been the commander of the Patrol Division on the day Officer Houts was shot. He testified about the equipment inside the standard patrol car Officer Houts was driving on the day of the shooting, including an MDT unit and a video camera. Murphy explained how the camera operated:
“The video camera is connected to the blue lights. The moment the blue lights come on, the video camera is programmed to instantly start recording. It records traffic stops. It can record anything. You can pull up to a building. And if you turn on your blue lights, the camera turns on. You don’t necessarily have to have the blue lights on to activate the camera. The officer can, also, manually, touch a button and start recording without necessarily having the blue lights on. But if you turn the blue lights on, the camera will come on automatically.”
(R. 1029.)
Agent A1 Mattox of the ABI testified that he was requested by the United States Attorney’s Office in Montgomery to view the video captured by the in-car dashboard camera in Officer Houts’s patrol car. Agent Mattox then identified State’s Exhibit 16 as the video he had viewed a couple of weeks earlier in the prosecutor’s office and that he believed to be the original videotape from Officer Houts’s vehicle. When the State sought to introduce the videotape Woodward objected, in relevant part, as follows: “[The prosecutor has] failed to establish a proper foundation in that Agent Mattox — Corporal Mattox has just testified, he saw it at their office but doesn’t know if it’s the same one or not, that was the original video.” (R. 1187.) He also objected on the ground that the State had “not established that it’s a fair and accurate depiction of what happened because they’ve had nobody to show that it is.” (R. 1188.) The trial court considered the legal requirements for the admission of a tape-recording of an event, and it overruled Woodward’s objections.
Woodward now argues that the trial court erred because, he says, the State failed to authenticate the videotape by presenting either a witness to testify that the videotape accurately reproduced the events he or she had witnessed, or a *1026 witness to testify that the videotape had not been altered. Because the State failed to authenticate the video in either of the foregoing ways, Woodward continues, the State was required to establish a proper chain of custody for the videotape, which it did not do. Therefore, Woodward concludes, the videotape should not have been admitted at trial.
As we have noted in previous portions of this opinion, a trial court is afforded substantial discretion in determining the admissibility of evidence, and this Court will reverse a court’s judgment or exercising of that discretion only when there has been a clear showing of an abuse of that discretion. E.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
Rule 901(a), Ala. R. Evid., provides that the authentication requirement “is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” Rule 901(b)(1), Ala. R. Evid., provides that “[tjestimony that a matter is what it is claimed to be” is sufficient authentication “conforming with the requirements of this rule.”
In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court explained the two methods for laying the foundation for the admissibility of sound recordings, videotapes, and similar evidence:
“The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the ‘silent witness’ foundation must be laid. Under the ‘silent witness’ theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the ‘silent witness’ theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudrie standard requires:
“(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded, “(2) a showing that the operator of the device or process or mechanism was competent,
“(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“(4) a showing that no changes, additions, or deletions have been made,
“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“(6) identification of the speakers, or persons pictured, and
“(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
“On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the ‘pictorial communication’ theory. Under this theory, the party offering the item must present sufficient evidence to meet the ‘reliable representation’ stan *1027 dard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.”
620 So.2d at 678.
The Alabama Supreme Court in Ex parte Fuller explained the basis for the “silent-witness” theory:
“The ‘silent witness’ theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness’s senses, and because the process or mechanism is explained before the photograph, etc., is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the photograph, etc., records.”
620 So.2d at 678.
Here, the State relied on the silent-witness theory to establish the predicate for admission of the videotape, and it presented testimony from Agent Gruhn and Murphy to establish the reliability and trustworthiness of the video-recording process in the video system of the patrol car, and it satisfied the required Voudrie standards, including a showing that the videotape had been preserved and that it had not been altered.[9]
Because the videotape was properly authenticated by the testimony of the law-enforcement officers through the “silent-witness theory” and because the State established that the video camera in the patrol car was a reliable mechanism that was capable of accurately recording the shooting, the State was not required to establish a chain of custody for the videotape. Harrison v. State, 869 So.2d 509, 515 (Ala.Crim.App.2002). The videotape was properly admitted at Woodward’s trial.
Woodward has failed to show any abuse of the trial court’s substantial discretion in the admission of the videotape testimony. Therefore, he is not entitled to any relief on this claim of error.
VII.
Woodward next argues that during the State’s rebuttal closing argument at the guilt phase the prosecutor commented on his failure to testify and implied that he had a burden to prove his innocence.
During rebuttal closing argument the State began:
“He wants his science but he doesn’t. He wants to predict what I’m going to say. He can read my mind. Ladies and gentlemen, smoke screens. That’s all you’ve heard for the last 20 minutes, smoke screens. He wants to attack the case but can’t do it, any logical, eviden-tiary way.
“I sat there, and I tried to think, look at this case from the reverse. We spent a lot of time talking about what connects the defendant to the crime. What evidence, before you, from witnesses, exhibits, common sense, disconnect the defendant from the crime? What?”
(R. 1322.) Woodward objected: “We have no burden here.” (R. 1322.) The trial court overruled the objection.
*1028 Woodward’s objection at trial was that the State was attempting to shift the burden of proof to him, while his objection on appeal also includes a claim that the prosecutor made a prohibited comment on his failure to testify. Because Woodward did not object at trial on the ground that the argument constituted a comment on his failure to testify, we review that portion of the argument for plain error only.
Questions about the propriety of counsel’s statements in closing argument are matters for the broad discretion of the trial court. See, e.g., Gobble v. State, 104 So.3d 920, 947 (Ala.Crim.App.2010) (quoting Acklin v. State, 790 So.2d 975, 1002 (Ala.Crim.App.2000)). A prosecutor may argue every legitimate inference from the evidence “and may examine, collate, shift and treat the evidence in his own way.” Taylor v. State, 666 So.2d 36, 64 (Ala.Crim.App.1994). A prosecutor’s arguments are to be examined in the context of the complete closing arguments and in the context of the evidence as a whole. The standard of review is not whether the defendant was prejudiced by a comment, but whether the comment “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
The prosecutor’s comment was directed to the strength of the State’s case and to the corresponding weakness in the defense’s theory of the case, and it was a fair comment based on the prosecutor’s inferences from all the evidence in the case. The comment did not shift the burden of proof, as Woodward argued at trial. See, e.g., Minor v. State, 914 So.2d 372, 423-24 (Ala.Crim.App.2004), and cases cited therein. Thus, the trial court did not abuse its considerable discretion when it overruled Woodward’s objection at trial. We also hold that the argument was not a comment on Woodward’s failure to testify, as Woodward argues on appeal. See, e.g., Arthur v. State, 711 So.2d 1031, 1049 (Ala.Crim.App.1996). We note, too, that the trial court instructed the jury that the State had the burden of proof, that the arguments of counsel were not evidence, and that the jury was not to draw any adverse inferences from Woodward’s failure to testify. Jurors are presumed to follow the trial court’s instructions. Calhoun v. State, 932 So.2d 923, 962 (Ala. Crim.App.2005).
No error, plain or otherwise, occurred here, and Woodward is not entitled to any relief on this claim.
VIII.
Woodward next argues that the trial court erred to reversal when it refused to instruct the jury that its decision should not be determined by the number of witnesses called by the parties.
Woodward’s fourth written requested jury instruction stated:
“Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.
“At all times, the burden of proof remains on the State to present proof beyond a reasonable doubt.”
(C. 941.)
During the charge conference the trial court stated: “Defense number four, I’m not going to give that. When no witnesses have testified for the defendant, it’s pretty self-evident, they’re not to weigh *1029 the number of the witnesses.” (R. 1283.) Woodward objected to the court’s failure to give the requested jury instruction after the trial court charged the jury. We find no error in the trial court’s decision.
“A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Crim.App.1986). When requested charges are either fairly and substantially covered by the trial judge’s oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).”
Ward v. State, 610 So.2d 1190, 1194 (Ala.Crim.App.1992).
This Court has upheld a trial court’s refusal of a defendant’s request for a virtually identical jury charge:
“The refusal of defendant’s requested charge number 8 was properly within the discretion of the trial judge. That charge was:
‘“The weight of the evidence is not necessarily determined by the number of witnesses testifying on either side. The jury should consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of greater credence. The jury may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.’
“This charge attempts to express, in an awkward fashion, the concept that the number of witnesses in a criminal trial is not the basis for determining the issue of guilt since a fact may be established as firmly by the testimony of one witness as by the testimony of an entire community. Smith v. State, 338 So.2d 1030 (Ala.Crim.App.1976), cert. denied, 338 So.2d 1033 (Ala.1976); Mann v. State, 20 Ala.App. 540, 103 So. 604 (1925). However, disparity in the number of witnesses is a circumstance not to be overlooked, especially where the witnesses have had an equal chance for observation and are of equal credibility and the jury may properly consider the number of witnesses testifying. 88 C.J.S. Trial, Section 369 (1955); 23A C.J.S. Criminal Law, Section 1248 (1961).
“We also find the charge somewhat confusing in that it discusses the weight of the evidence and the credibility of witnesses.”
White v. State, 410 So.2d 135, 137 (Ala.Crim.App.1981).
Based on this Court’s decision in White, the trial court here clearly did not err when it refused to give Woodward’s requested charge. As this Court noted in White, the charge was a misstatement of the law and was confusing. See also McMillian v. State, 448 So.2d 463 (Ala.Crim.App.1984) (noting that “disparity in the number of witnesses is a circumstance the jury may properly consider in reaching its verdict”).
Because the trial court properly refused the requested charge, Woodward is not entitled to any relief on this claim of error.

Penalty-phase Issues

IX.
Woodward next argues that he was denied his Eighth Amendment right to an individualized sentence because, he says, when determining the appropriate sentence for Woodward, the trial court considered the sentences imposed in other capital cases involving the murder of a *1030 police officer. He argues that the trial court’s consideration of other cases in determining his sentence also violated § 18A-5-53(b), Ala.Code 1975, because, he says, proportionality review is the duty of this Court and not of a trial court. Woodward did not raise this issue in the trial court, so we review the argument for plain error only.
The law is clear that a defendant who has been convicted of capital murder is entitled to an individualized sentencing determination that is based on the circumstances of the crime committed and on the defendant’s character. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Alabama law establishes that, in deciding upon the proper sentence in a capital-murder case, the trial court must determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and it must take into consideration the advisory verdict of the jury. The sentence imposed on an alleged accomplice has no bearing on a defendant’s sentence, and it should not be considered by a trial court. Coulter v. State, 438 So.2d 336 (Ala.Crim.App.1982), aff'd, 438 So.2d 352 (Ala.1983). The foregoing principles were not violated in this case.
A review of the trial court’s thorough sentencing order and its oral pronouncement of the death sentence at the conclusion of the final sentencing hearing discloses that the trial court’s sentence was based solely on the evidence presented at both phases of the trial and on the testimony and evidence presented at the final sentencing hearing and that it took into account the jury’s advisory verdict. In its written sentencing order the trial court made findings of fact, made specific findings regarding the aggravating circumstances and the mitigating circumstances, and explained its reasons for overriding the jury’s recommended sentence of life imprisonment without parole. There is no indication that the trial court relied on improper evidence in reaching its sentencing determination or that, in weighing the aggravating circumstances and the mitigating circumstances, it considered the sentence imposed in any other cases. To the contrary, the record discloses that Woodward received the individualized sentencing to which he was entitled.
Although we find that Woodward received an individualized sentence, we note that the prosecution incorrectly argued to the trial court in its amended sentencing memorandum that the trial court had a duty under § 13A-5-53(b), Ala.Code 1975, to address whether the appellant’s sentence was disproportionate or excessive when compared to other sentences involved in similar cases. The statute clearly provides that review of the proportionality of a death sentence is to be performed by this Court, subject to review by the Alabama Supreme Court. A proportionality review is not a duty for the trial court. § 13A-5-53(b), Ala.Code 1975. See also Ex parte Thomas, 460 So.2d 216 (Ala.1984); Ex parte Tomlin, 909 So.2d 283, 286 (Ala.2003). However, Woodward did not object in the trial court to the State’s erroneous argument in its sentencing memorandum, nor did he move to strike the argument.
Near the end of its closing argument at the sentencing hearing before the trial court, the State mentioned the sentencing memorandum and its citation to other cases. It argued:
“Our memorandum brief shows the Court every case we could find in which a law enforcement officer has been killed in the State of Alabama and prosecuted for capital murder. There were some 23 cases. Of those cases, nearly half — 10— a jury recommended life without parole, *1031 a judge overrode. And not one of those cases was reversed because of the override. Some were reversed — and we pointed that out in our memorandum— because of errors or uncertainties in sentencing orders and other things. But, clearly, the law of this state is that this Court can override. And when you compare our case to the facts of other cases, this fits right in. In fact, only two cases that we could find where a law enforcement officer was killed, intentionally, the defendants got life without parole. One, the victims came to the State and said, State, request life without parole. The State did. The Judge told the jury. And they came back, life without parole. The other one, [case name omitted], apparently, according to the opinion in this last paragraph, states that they believe that the jury came back life without parole because of the evidence of mental disease or defect which is not present here. Those two cases are distinguishable.”
(R. 1777-78.) (Emphasis added.)
As noted above, Woodward did not object to the State’s argument. In fact, in his opening statement during his argument to the trial court at the sentencing hearing Woodward stated: “Your Honor, the defendant would not disagree with the entire presentation of [the prosecutor’s] grounds for a jury override.” (R. 1779.) He also argued that several defendants who had been convicted of killing law-enforcement officers had been sentenced to life imprisonment without the possibility of parole. Later in his argument to the trial court, when discussing cases in which Alabama’s appellate courts had reversed judgments in which the trial judge overrode a jury’s verdict of life imprisonment without the possibility of parole and imposed a death sentence, Woodward even argued: “And I would challenge the State to come up with cases where the juries — where the Judges — are just ignoring jury verdicts.” (R. 1786.)
Thus, a review of the record indicates that the State’s primary purpose in even discussing other cases was to provide support for its argument that the trial court was authorized to override the jury’s sentence recommendation and should do so in Woodward’s case; Woodward, too, in his argument to the trial court encouraging the court not to override the jury’s verdict mentioned other cases involving jury-verdict overrides.
It is clear to this Court that the trial court did not rely on either party’s reference to other cases in determining the proper sentence for Woodward. The trial court set forth clearly its findings regarding aggravating circumstances and the mitigating circumstances, and it discussed its weighing of those factors to reach its sentencing decision. There is no indication that the trial court relied on other cases in reaching that sentencing determination. Apart from the fact that the record discloses no evidence indicating that the trial court relied on improper factors in determining Woodward’s sentence, we note, too, that trial judges are presumed to know and to follow the law. See, e.g., Ex parte Slaton, 680 So.2d 909 (Ala.1996); Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007), aff'd, 11 So.3d 323 (Ala.2008). We presume that the trial court did not rely on factors other than those mandated in the sentencing statute.
We are aware — as Woodward argues for the first time on appeal — that the trial court noted at the conclusion of its sentencing order that “a death sentence in cases involving the murder of a police officer is not unusual or disproportionate.” (C. 994.) This statement was made after the trial court had already clearly stated that the aggravating circumstances outweighed the mitigating circumstances, in- *1032 eluding the jury’s sentencing recommendation, which is the standard required for the imposition of a death sentence. §§ 13A-5-47(e), 13A-5-48, Ala.Code 1975. See also Ex parte Carroll, 852 So.2d 833 (Ala.2002). It is clear to this Court that the trial court’s statement that death sentences have been imposed in other cases involving the murder of a police officer did not constitute an improper proportionality review. The trial court’s statement also does not demonstrate that the trial court’s weighing of the aggravating circumstances and the mitigating circumstances or its determination of the proper sentence in this case was based on its consideration of any other cases. At most, the trial court’s statement summarizes arguments made by both the State and Woodward to the effect that the murder of police officers had resulted in death sentences for the defendants. See Sockwell v. State, 675 So.2d 4, 30 (Ala.Crim.App.1993) (reference in sentencing order to extraneous matters did not require reversal where sentencing order did not reflect that trial court considered extraneous matter in the imposition of sentence), aff'd, 675 So.2d 38 (Ala.1995). In a case presenting circumstances very similar to those here, Harris v. State, 2 So.3d 880, 930 (Ala.Crim.App.2007), this Court found no plain error. Harris was found guilty of capital murder following the shooting deaths of six victims, and the jury recommended a sentence of life imprisonment without parole. The trial court overrode the jury’s advisory verdict and, in its sentencing order, explained its reasons for its decision, including a review of other cases:
“In its order, the trial court outlined its reasons for overriding the jury’s verdict recommending a sentence of life without parole. It added that it had seen no case in which a defendant had killed six victims pursuant to one scheme or course of conduct. It cited a number of cases with multiple victims — all of which involved fewer than six victims — in which the trial courts overrode the juries’ recommendations for life in prison without the possibility of parole. In each case, this Court upheld the trial courts’ decisions to override the juries’ recommendations. As the trial court pointed out, when compared with the fact of similar cases, a task the jury could not undertake, ‘the only disproportionate sentence in this case would be to sentence Harris to life without parole instead of death.’ ...”
Harris v. State, 2 So.3d at 930. Finding no plain error in Harris, we likewise find no plain error with the trial court’s isolated statement in this case.
The cases Woodward relies on, including Ex parte Tomlin, 909 So.2d 283 (Ala.2003), and Apicella v. State, 945 So.2d 485 (Ala.Crim.App.2006), are distinguishable. In Ex parte Tomlin, the trial court overrode the jury’s recommendation of life imprisonment without parole based on the sentence imposed on Tomlin’s codefendant. In Api-cella, this Court reversed the dismissal of a postconviction Rule 32, Ala. R.Crim. P., petition and remanded the case for further proceedings based on pleadings that revealed that a trial judge might have based his override of a jury’s sentencing recommendation of life imprisonment without parole on the sentence imposed on the eode-fendant.
In view of the fact that Woodward did not raise this issue in the trial court and that nothing in the record indicates that the trial court considered the sentences of other defendants in weighing the aggravating and mitigating circumstances in order to determine the proper sentence in this case, we find no error and certainly no error rising to the level of plain error adversely affecting any of Woodward’s substantial rights.
*1033 X.
Woodward next argues that the trial court’s admission and consideration of exhibits that were not introduced at the sentencing hearing before the jury and that were not the subject of a factual dispute in the presentence-investigation report (“PSI”) violated § 13A-5-47, Ala. Code 1975, because, he says, that statute permits a trial court to consider only the PSI and evidence about any part of the PSI that was the subject of a factual dispute. Specifically, Woodward argues that the trial court should not have admitted into evidence or considered audio recordings and transcripts of telephone calls Woodward made from the jail.
Woodward objected to the admission of these exhibits at the sentencing hearing before the trial court, but he argued only that the exhibits were irrelevant. Therefore, he did not preserve for review the claim he now makes, and we review the argument for plain error only. We find no error or plain error.
Section 13A-5-47(b), Ala.Code 1975, provides:
“Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.”
Woodward argues that the statute limits the evidence that can be admitted at a sentencing hearing before the judge to only that evidence addressing any part of the PSI that is the subject of a factual dispute. He further argues that § 13A-5-45(d), Ala.Code 1975, stating that probative, relevant evidence shall be received at the sentencing hearing applies only to the sentencing hearing before the jury. Woodward does not cite to any controlling precedent for this proposition. Our research reveals only authority that directly contradicts Woodward’s argument.
First, the United States Supreme Court has held that a sentencing authority must consider all evidence offered as mitigating, that is, “any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnote omitted). See also Eddings v. Oklahoma, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (“Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sen-tencer refuse to consider, as a matter of law, any relevant mitigating evidence.”). In Alabama the trial judge is the sentencing authority, and the jury’s advisory verdict is a recommendation that is not binding on the judge. § 13A-5-47 (a), (e), Ala.Code 1975; Ex parte Carroll, 852 So.2d 821, 826-27 (Ala.2001). If, as Woodward now argues, § 13A-5-47(d) excludes all relevant evidence except that evidence concerning a factual dispute in the PSI, a logical extension of that argument is that no additional mitigation proffered by a defendant could be admitted into evidence at a sentencing hearing before a trial judge unless that evidence, too, concerned a factual dispute in the PSI. Woodward’s interpretation of the statute could result in the exclusion of relevant proffered mitigation and create reversible error because it *1034 might deny a sentencer relevant information about a defendant’s character or background, in violation of Lockett and its progeny.[10]
Second, Woodward’s interpretation of the statute is inconsistent with the current practice in capital cases in Alabama. Both parties at the sentencing hearing before the trial judge in a capital case routinely present additional testimony not necessarily related to the PSI. E.g., Ex parte Carroll, 852 So.2d 833 (Ala.2002); McMillan v. State, [Ms. CR-08-1954, Nov. 5, 2010] — So.3d - (Ala.Crim.App.2010); Mitchell v. State, 84 So.3d 968, 992 (Ala.Crim.App.2010); Washington v. State, 106 So.3d 423 (Ala.Crim.App.2007) (opinion on return to remand), rav'd on other grounds, 106 So.3d 441 (Ala.2011); Scott v. State, 937 So.2d 1065, 1071 (Ala.Crim.App.2005). In McGahee v. State, 885 So.2d 191 (Ala.Crim.App.2003), when reviewing a claim that counsel had rendered ineffective assistance when he failed to present additional testimony at the sentencing hearing before the trial judge, we stated: “Trial counsel could have called more witnesses at the penalty-phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury’s recommendation and to sentence McGahee to life imprisonment without parole.” 885 So.2d at 221 (footnote omitted). The United States Court of Appeals for the Eleventh Circuit has also recognized that additional evidence may be admitted at the hearing before the sentencing judge. See, e.g., Brownlee v. Haley, 306 F.3d 1043, 1050 (11th Cir.2002) (“After the jury has returned its advisory verdict at the sentencing phase, the trial judge orders and receives a presentence investigation report, hears further arguments, and may receive additional evidence concerning the aggravating and mitigating factors.”).
Finally, Woodward’s argument — that the capital-sentencing statute allows broad admission of all evidence relevant to sentence only at the sentencing hearing held before a jury pursuant to § 13A-5-45, Ala. Code 1975, while the admission of evidence in a sentence hearing before the trial court held pursuant to § 13A-5-47, Ala.Code 1975, is limited to that evidence concerning factual disputes in the PSI — is inconsistent with the overall theory of sentencing in capital cases in Alabama. For example, in Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), the appellant argued that the trial court had considered improper information in the presentence report when it overrode the jury’s sentencing recommendation. This Court determined that the trial court had properly considered information in the presentence report and stated:
“We are convinced after reviewing the record that the trial court’s use of the presentence report in determining the appellant’s sentence was consistent with § 13A-5-45(d), which states:
“ ‘Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection *1035 shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.’ ”
Bush v. State, 695 So.2d at 92. See also Hyde v. State, 778 So.2d 199, 218-19 (Ala.Crim.App.1998) (quoting both § 13A-5-45(d) and § 13A-5-47(b), Ala.Code 1975, when discussing the evidence used at a sentencing hearing before the trial court), aff'd, 778 So.2d 237 (Ala.2000).
Therefore, contrary to Woodward’s argument on appeal, § 13A-5-47(b) does not exclude from admission all evidence at the sentencing hearing before the trial judge except for evidence that concerns a factual dispute in the PSI.
Finding no general prohibition against evidence unrelated to a factual dispute in the PSI, we reject Woodward’s argument as to his newly raised claim on appeal.
We hold, in the alternative, that the audio recordings and transcripts of telephone calls Woodward made from the Montgomery jail were relevant to information contained in the PSI that was related to the proffered mitigating circumstances — Woodward’s upbringing in a dysfunctional family and his relationship with his own children, whom he loved and who loved him. The telephone calls included information that went to the sources of his financial contributions to his children and their mothers, and the calls included information calling into question whether Woodward’s father had been as abusive to Woodward as Woodward had portrayed. The evidence was properly admitted even under Woodward’s constricted view of § 13A-5-47(b).
Because we find no plain error, we hold that Woodward is not entitled to any relief on this claim.
XI.
Woodward next argues that the trial court committed plain error when, at the final sentencing hearing, it admitted and then considered the report of the court-ordered mental evaluation of Woodward conducted before trial.
During pretrial proceedings Woodward filed a notice of his intent to pursue a plea of not guilty by reason of mental disease or defect, and the trial court ordered Woodward to undergo a mental-health evaluation. Dr. Glen King conducted the evaluation and determined that Woodward was competent to stand trial and that, at the time of the offense, Woodward was not suffering from a serious mental illness or defect that rendered him incapable of understanding the nature and quality or wrongfulness of his actions. Woodward did not raise an insanity defense at trial.
At the sentencing hearing before the trial judge the State offered Dr. King’s report into evidence. The trial court admitted the report without objection from Woodward. Woodward now argues that the trial court should not have admitted the report into evidence because he never presented any evidence about his mental condition and the State had no basis for the admission of the report. He cites Rule 11.2(b)(2), Ala. R.Crim. P., in support of his argument. Woodward also argues that the trial court’s admission and consideration of the report violated his Fifth Amendment privilege against self-incrimination, and he cites Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Specifically, Woodward claims that Dr. King did not inform him that the results of the evaluation could be used against him at sentencing. Woodward also argues that the admission of Dr. King’s report prejudiced him because, he says, the trial court relied on the report in sentencing him to death.
*1036 Rule 11.2(b), Ala. R.Crim. P., governs the admissibility of testimony about statements made by a defendant during a mental examination. Rule 11.2(b)(2) provides:
“(2) The results of mental examinations made pursuant to subsection (a)(2) of this rule [providing for examination of the defendant’s mental condition at the time of the offense] and the results of similar examinations regarding the defendant’s mental condition at the time of the offense conducted pursuant to Rule 11.4 shall be admissible in evidence on the issue of the defendant’s mental condition at the time of the offense only if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant’s consent, no statement made by the defendant during the course of any examination, no testimony by an examining psychiatrist or psychologist based upon such a statement, and no other evidence directly derived from the defendant’s statement shall be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified.”
Woodward did not testify at trial. Applying the plain language of Rule 11.2(b)(2), we must conclude that error occurred in the admission of Dr. King’s forensic evaluation report. See Ex parte Brownfield, 44 So.3d 43 (Ala.2009).
Although the forensic evaluation should not have been admitted at the sentencing hearing, we must consider whether the error rose to the level of plain error. Woodward’s failure to object weighs heavily against him in our review for plain error. Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997).
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998); Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998); Johnson v. State, 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001).
Woodward cannot establish that the admission of Dr. King’s report was plain error. First, contrary to Woodward’s assertion on appeal, the sentencing order does not disclose that the trial court relied on Dr. King’s report in its sentencing determination, and the sentencing order does not refer to the report or to any evidence derived from statements Woodward made to Dr. King during his evaluation of Woodward. Therefore, any error in the trial court’s alleged improper reliance on Dr. King’s report was not plain on the face of the record. Second, although the State twice mentioned Dr. King’s report in its argument to the trial court at the sentencing hearing, once stating that Dr. King’s report proved Woodward was a drug dealer and once stating that Woodward told Dr. King that he stopped attending school because he chose the streets over school, evidence of Woodward’s drug dealing and choice of a life on the streets instead of in school was obvious from other evidence presented at the trial — particularly the *1037 presentence report and the telephone calls Woodward placed while he was in jail— and not only from Dr. King’s report. Therefore, the introduction of the report was not particularly egregious and it did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. There was no plain error as to this issue, and Woodward is not entitled to any relief on this claim.
XII.
Woodward argues that the trial court erred when it overrode the jury’s advisory sentence and sentenced him to death because, he says, the trial court did not have a proper basis to override the jury’s verdict. Specifically, Woodward argues that the evidence the jury did not hear and that the trial court relied on in sentencing him to death did not undermine a mitigating circumstance he had proffered. Woodward did not object to the trial court’s sentencing order or the court’s findings, so we review this issue for plain error only. See Rule 45A, Ala. R.App. P.
Section 13A-5-47(e), Ala.Code 1975, commonly referred to as Alabama’s judicial-override statute, states:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
In Ex parte Carroll, 852 So.2d 833 (Ala.2002), the Alabama Supreme Court discussed the consideration due a jiffy’s advisory verdict in deciding the proper sentence, pursuant to § 13A-5-47(e), Ala. Code 1975:
“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the ‘triggerman’ or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.”
852 So.2d at 836 (footnote omitted).
In order to address Woodward’s claim regarding the judicial override of the jury’s recommendation, we quote extensively from the trial court’s thorough sentencing order. The trial court stated, in relevant part:

“Mitigating Factors

“The Defendant offered no evidence concerning the statutory factors listed in Section 13A-5-51, and the Court heard no evidence that would tend to indicate that any of the statutory factors are applicable. Specifically this Court finds the following statutory mitigating factors were not proven: 1. There was no evidence that Defendant has no significant history of prior criminal activity: in fact he has convictions for Manslaughter and [Possession of Marijuana, First Degree]. 2. There was no evidence that the *1038 offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. 3. The Victim was not a participant in the Defendant’s conduct or consented to it; Officer Houts was simply doing his job. 4. The Defendant was not an accomplice in the capital offense committed by another person and his participation was not relatively minor; he acted alone. 5. The Defendant did not act under extreme duress or under the substantial domination of another person. 6. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; he has vehemently maintained that he has never suffered mental infirmities and a mental evaluation supported his contention. 7. The age of the Defendant at the time of the crime was nearly thirty-three years of age.
“Pursuant to Section 18A-5-52, Defendant did offer evidence of two non-statutory mitigating factors: his relationship with his children and his dysfunctional family.
“Defendant has five children by four women. Three of the children and one of their mothers testified at the hearing. The gist of the testimony was that the Defendant was a good father, visited with his children, purchased clothes for them, and took them places. He also encouraged them to do well in school and stay out of trouble.
There was testimony about Defendant’s childhood. His father was in the Air Force until he was discharged for dealing drugs. The family settled in Montgomery. Defendant’s mother testified that the parent’s relationship was stormy — several times she moved her children with her to Detroit, citing physical and emotional abuse to her and her children. Defendant’s father supported the family by selling drugs until he served five years in federal prison for selling marijuana. The parents divorced soon after the father was released from prison. Defendant’s mother also testified that when Defendant was about fourteen years old, Defendant was banished from the home by his father for a vague incident involving the family dog. Incredibly, Defendant was not allowed to return home even when the father was sent to prison. Defendant’s academic career had already terminated despite the fact the Defendant earned A’s and B’s early in his academic career.
“The third mitigating factor is the 8-4 recommendation of the jury for life imprisonment without the possibility of parole [see Section 13A-5-47(e) ].
“This Court considered all the evidence offered in support of these three mitigating factors and finds their existence.

“Weighing the Factors

“Section 13A-5-47 mandates that this Court undertake an independent weighing of the aggravating and mitigating factors in determining the appropriate sentence. Turning first to the mitigating factors, the Court is underwhelmed by Defendant’s family situation. Defendant’s very young children like him; he bought them clothes, took them places, and was a positive influence on them. What young child does not adore a parent? As for being a provider, Defendant appeared to do a bare minimum for his brood. He did not provide a home for any of them or their mothers. He lived in an apartment with yet another woman. When his children visited, they met at Defendant’s mother’s house. Buying clothes for his children on occasion is hardly being a responsible parent. He did not pay child support; the *1039 weight of the evidence indicates that he lacked a legitimate occupation that would provide the means to support families.
“Counsel for Defendant suggested that Defendant was a good father because he told his children to stay in school and make good grades. If actions do, indeed, speak louder than words, then Defendant made a very poor parenting role model. Defendant was convicted of possession of nearly a pound of marihuana. His criminal history reveals numerous weapons charges as a juvenile, and his time in prison was rife with infractions ranging from narcotics to assault.
“Likewise, Defendant’s evidence of problems in his oum childhood does not withstand close scrutiny. His mother and sister portrayed Defendant’s youth as replete with beatings and verbal abuse from his father. The defense contended that Defendant’s father’s abuse ruined his academic career and that the father eventually expelled Defendant from the house.
“On the other hand, no documentation of the abuse was introduced. His truncated academic career may well have been the result of his bringing weapons to school, not the result of family issues. During an estrangement in the marriage, Defendant’s mother sent her children back to Alabama to live with their father for the summer. What kind of mother sends her children to live alone, unprotected with an abusive man? In addition, it strains logic to accept the story that Defendant’s father evicted him. Even after the father went off to prison for five years, Defendant’s mother testified that his influence was so strong that Defendant could not return home. Yet, at the sentencing hearing before this Court, the prosecution introduced evidence that Defendant’s mother reported that Defendant had run away from home two years after the father allegedly evicted him.
“Finally, in recordings of telephone conversations from jail between Defendant and his father, a picture emerged of a concerned parent who rued his son’s rejection of his advice to travel a different road. The Court acknowledges that these conversations occurred long after the alleged eviction and that father and son could have reconciled in the interim, but the conversations do not mesh with the picture painted by the defense at the penalty phase. While Defendant’s childhood was not the stuff of fairytales, his youth appears more idyllic than those of others he called to testify. One friend even described him as ‘spoiled,’ noting that he lived in a nice house with a swimming pool. The Court also notes that Defendant’s siblings have managed to lead productive lives.
“Even viewed in the kindest possible light, the mitigating evidence offered by Defendant is not very persuasive. However, when exposed to the glare of all the evidence, these mitigating factors are substantially diminished.
“The third mitigating factor is the one which gives this Court the most pause: the jury’s recommendation of life without the possibility of parole by 8-4 vote. The Court was genuinely impressed with the jury. Following the extensive voir dire, the Court was convinced, and still is, that these jurors were intelligent, conscientious citizens.
“However, this Court has access to information which the jury did not hear, rebutting the evidence about the first two mitigating factors. Defendant has an extensive criminal record involving firearms and the possession of a large quantity of marihuana. He accumulated an impressive list of disciplinary *1040 citations while incarcerated. It is unlikely that the jury would have considered Defendant to be a viable candidate as a role model for his children if the jurors had heard this testimony.
“Moreover, the jury was told by Defendant’s witnesses during the penalty phase that Defendant was a provider for his children and the various mothers. Witnesses testified that Defendant worked for a realty company, in the construction industry, and for his father. The evidence at the sentencing hearing before this Court casts a strong doubt on the portrayal of Defendant as a responsible father working to provide for his children. Defendant has never paid taxes or filed a tax return. There is no record with the State of his having ever held a legitimate job. How then does he provide for his children? After his release from prison for Manslaughter, he was convicted of possessing almost a pound of marijuana. His recorded conversations from jail played at the sentencing hearing before this Court lend credence to the belief that he was still involved in the narcotics trade.
“Finally, when the jury returned with a verdict of guilty, the Court observed that several of the jurors were visibly distraught. Since the evidence of Defendant’s guilt was overwhelming, the Court surmises that at least some of the jurors were daunted by the task which they knew they would face upon a finding of guilt. Then, during the sentencing phase, the jury heard from Defendant’s children. Unquestionably, wisely, and apparently effectively, defense counsel was playing, in part, to the sympathies of the jurors. In arguing for a recommendation of life without parole, counsel for Defendant asked the jury whether they would be able to look into the eyes of Defendant’s children after their decision. It was a powerful, emotional appeal to citizens who were faced with a most awesome decision.”
(C. 1000-03.)(Emphasis added.)
Woodward argues that the trial court’s determination that Woodward was a poor parenting role model did not properly undermine the mitigating circumstance that Woodward loved his family and that his family loved him. That mitigating circumstance, Woodward says, was undisputed. Woodward also argues that the trial court’s determination that the telephone conversations he had with his father while Woodward was in jail did not undermine the mitigating circumstance that Woodward had had a difficult upbringing. This newly raised claim of error is based on an unreasonable parsing of portions of the sentencing order and not on a consideration of the order as a whole. It is significant to note at the outset that the trial court’s override of the jury’s verdict was based on far more than the two statements on which Woodward now focuses that were related to evidence the jury did not hear. After reviewing the trial court’s very thorough order, we conclude that the trial court meticulously complied with Alabama law regarding override of a jury’s recommendation and that its sentencing decision had a proper basis. In fact, the trial court at the judicial sentencing hearing stated that it was aware of and had read Ex parte Carroll. (R. 1740-41.)
The trial court considered the jury’s advisory verdict as a mitigating circumstance and it gave the jury’s recommendation great weight. The court mentioned evidence that the jury did not hear, and it explained in detail how that evidence undermined the mitigating evidence proffered by Woodward — evidence the trial court had already explained it afforded little weight. Woodward, himself, in his closing argument to the trial court at the *1041 hearing, expressed his understanding that the additional evidence might impact the court’s sentencing determination, and he encouraged the court not to give that evidence any weight.[11] Woodward stated:
“The jury vote for life [is] entitled to deference, but we do acknowledge that such a vote may be undermined by the existence of evidence to which the jury was not exposed. You’ve heard additional evidence here today that we don’t dispute the jury didn’t hear. However, again, Judge, this evidence does not rise to the level to aggravate this offense or to ignore the jury verdict and come up with a jury override.
[[Image here]]
[[Image here]]
“No evidence was withheld from the jury that would actually serve as a basis for overriding. Judge, I would submit to you, the jury could have heard all of this, whether or not he was on a child support order, whether or not he was a good father or whether or not there’s tax records somewhere in the state since the past number of years. I don’t think that would have changed the 'jury’s mind. Those aren’t aggravating factors, regardless. They’re factors — They’re explanations about the defendant’s life history and the way he was growing up and the way he’s been as a father or as an employee. And they’re just things that — We admit, Judge, he’s not a perfect father or the most tax-paying, productive citizen. But those aren’t reasons when someone’s already going to get life without parole to put them on death row.”
(R. 1783-84.) (Emphasis added.)
The trial court’s order clearly explains how evidence the jury did not hear diminished the mitigating evidence and arguments Woodward offered. The order also clearly indicates that the trial court’s override was not based solely — or even primarily — on that evidence. As demonstrated in the above-quoted portions of the sentencing order, the trial court provided an adequate basis for its override of the jury’s advisory verdict. Therefore, Woodward is not entitled to relief on this claim of error.
XIII.
Woodward next argues that the trial court erred when it permitted Lori Holsomback, the victim’s sister, to testify in rebuttal at the penalty phase in a manner that Woodward says exceeded the limitations on victim-impact testimony. Specifically, he argues that the trial court erred when it overruled his objections to Holsomback’s testimony that her daughter “thought Jesus could deliver Christmas presents to Officer Houts in heaven” because, he says, the testimony did not address any specific loss to the victim’s family. (Woodward’s brief, at p. 106.) He argues, too, that the evidence failed to rebut any evidence presented by the defense and that the testimony was unduly prejudicial.
Holsomback testified in rebuttal at the sentencing hearing before the jury about the impact Officer Houts’s death had on her two older children, who had been close to their uncle. She stated that a few weeks before Christmas in the year Officer Houts was killed her daughter suggested that they buy her uncle a Christmas present and put it outside so that Jesus might take it to Officer Houts. In response to Woodward’s objection to this testimony the prosecutor stated:
*1042 “They offered into evidence a photograph of the defendant with children opening Christmas presents. They’ve introduced evidence of what Christmas was like without him being there. That’s all we’re trying to do through the one witness. And it does directly impact her daughter and herself.”
(R. 1622.)
The trial court overruled Woodward’s objection. Holsomback further testified that she had to explain to her daughter that they could not send Officer Houts a Christmas present, and that he was not coming back. Holsomback stated that her daughter was then seven years old and she “couldn’t understand that it was forever.” (R. 1623.)
This Court has upheld the admission of similar testimony offered during the State’s rebuttal case, and we find no error in the trial court’s ruling here, which we have reviewed for an abuse of discretion. In Woods v. State, 13 So.3d 1 (Ala.Crim. App.2007), this Court stated:
“In Payne v. Tennessee, 501 U.S. 808 (1991), the United States Supreme Court held:
“ ‘[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. “[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.” Booth [v. Maryland ], 482 U.S. [496, 517 (1987) ] (White, J., dissenting) (citation omitted). By turning the victim into a “faceless stranger at the penalty phase of a capital trial,” [South Carolina v.] Gathers, 490 U.S. [805, 821 (1989)] (O’Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.’
“501 U.S. at 825. The Supreme Court further stated:
“‘We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecuto-rial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.’
“Payne, 501 U.S. at 827. The Supreme Court recognized that victim-impact evidence ‘is designed to show instead each victim’s “uniqueness as an individual human being,” whatever the jury might think the loss to the community resulting from his death might be.’ Payne, 501 U.S. at 823.
“Here, the testimony provided by the officers’ widows was offered to show that each officer’s death caused a unique loss to his family and to show the impact the murders had on the family members. Part of that testimony, the portion about which Woods apparently is complaining here, was elicited to show that Officer Owen was married and had children and grandchildren, that Officer Bennett was *1043 married and had a child, and that Officer Chisolm was married and had planned to start a family. This testimony was offered in rebuttal to the evidence Woods offered as mitigation — that he was a father of three children whom he loved very much. This was legitimate victim-impact evidence, which we have previously held to be admissible during the penalty phase of a capital-murder trial. See, e.g., Belisle v. State, 11 So.3d 256, 317 (Ala.Crim.App.2007). The trial court did not abuse its discretion when it permitted the witnesses to testify about the victims and their families.”
Woods v. State, 13 So.3d at 35-36 (footnote omitted; emphasis added).
As we held in Woods, and for the same reasons, we now hold that the trial court did not abuse its considerable discretion here when it admitted Holsomback’s testimony in rebuttal. We note, too, that Woodward requested that the trial court instruct the jury specifically about victim-impact evidence, and the court gave that instruction. The trial court also instructed the jury that its verdict should be based on the evidence and the law, and not on passion, prejudice, or any arbitrary factor.
Woodward is not entitled to relief on this claim of error.
XIV.
Woodward argues that the trial court erred when it refused to admit into evidence at the sentence hearing before the jury a videotape of a mitigation specialist talking with four of Woodward’s children and two of his nephews. He says that the video depicted the children recalling fun experiences they had had with Woodward and explaining that they missed him. He further states that the evidence would have provided a “glimpse of family members who did not testify,” along with “expressions of affection for Mr. Woodward,” and that there is a strong probability that the evidence might have changed the vote of at least one juror who had voted for a death sentence.
A trial court has substantial discretion in deciding whether to admit evidence at a sentencing hearing. E.g., Ex parte Peraita, 897 So.2d 1227, 1231 (Ala.2004).
Woodward argued at the beginning of the penalty-phase hearing before the jury that the videotape with the children should be admitted. Woodward argued that, although he “could arguably put these young children on the stand live, it would be a certain traumatic effect to do that in light of the fact that they just had their father convicted of capital murder and facing life without parole or death.” (R. 1354.) The trial court stated that the videotape offered unsworn testimony and included the thoughts of the family on the sentence that should be imposed, testimony that was not allowed by the sentencing statute or by caselaw. Defense counsel then said that he was trying to get the children to court to testify, but that Woodward had told some of the children’s mothers not to come to court.
The trial court did not abuse its substantial discretion when it excluded the videotape of the mitigation specialist talking with the children. The trial court correctly stated that family members’ opinions as to sentencing are not admissible because that evidence was not relevant. See, e.g., Taylor v. State, 666 So.2d 36, 51-53 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). Furthermore, as the State correctly points out in its brief on appeal, Woodward presented testimony at the sentencing hearing from three of his five children. The children testified about the positive relationship they had with Woodward and about their love for him. Thus, *1044 that portion of the proffered evidence was cumulative and would have been subject to exclusion on that basis. Dotch v. State, 67 So.Sd 936, 973-74 (Ala.Crim.App.2010). Finally, even if we had determined that the trial court had abused its substantial discretion in excluding the videotape from evidence, the error would have been harmless for two reasons: first, the jury recommended that Woodward be sentenced to life in prison without the possibility of parole. Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010), and, second, the trial court found Woodward’s relationship with his children as a nonstatutory mitigating circumstance, even without the admission of the videotape.
For all the foregoing reasons, Woodward is not entitled to relief on this claim of error.
XV.
Woodward next argues that the prosecutors made improper remarks in their closing arguments to the jury at the penalty phase. Specifically, Woodward argues that the prosecutors misstated the law, presented personal opinions, drew improper comparisons between Woodward and the victim, commented on his failure to testify, and argued deterrence as a reason to sentence Woodward to death. He argues that the allegedly improper arguments — individually and collectively— might have influenced the jury by affecting even one juror’s vote as to sentencing.
Woodward did not object to any of the comments he now argues were improper, so we review this claim for plain error only. Rule 45, Ala. R.App. P. “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985).
“The United States Supreme Court has stated that, when considering a prosecutor’s closing argument, the standard is whether the argument ‘ “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The argument is to be viewed in its entirety, and, to justify reversal, the argument must have resulted in substantial prejudice to the defendant. Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992).”
Ex parte Brown, 74 So.3d 1039, 1051 (Ala.2011).
“ ‘ “In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Crim.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Crim.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Crim.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Crim.App.1984); Sanders v. *1045 State, 426 So.2d 497, 509 (Ala.Crim. App.1982).” ’
“Barber v. State, 952 So.2d 393, 437-38 (Ala.Crim.App.2005), quoting Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989).”
Brown v. State, 11 So.3d 866, 909 (Ala.Crim.App.2007), aff'd, 11 So.3d 933 (Ala.2008).
We note that the trial court instructed the jury on several occasions that the attorneys’ arguments were not to be considered evidence and that the court would instruct the jury as to the applicable law.
We have reviewed all of Woodward’s claims regarding the prosecution’s arguments, and we find no error or plain error.
A.
Woodward argues that the State misled the jury and misstated the law when it characterized his proffered mitigating circumstances as “excuses.” In McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010), this Court considered whether the prosecutor had impermissibly argued that the mitigating circumstances offered by McCray “[didn’t] mean squat.” We found no error and stated, in relevant part:
“Further, when read in context, the prosecutor’s argument that the mitigating circumstances offered by McCray ‘don’t mean squat’ was clearly nothing more than an argument that the three aggravating circumstances offered by the prosecution far outweighed the mitigating circumstances offered by the defense and that McCray should be sentenced to death. This, too, was a proper argument. ‘ “[Ijmpeachment of the evidence of a defendant and the matter of impairment of its weight are properly matters for argument of counsel ....”’ Burgess [v. State], 827 So.2d [134,] 162 (Ala.Crim.App.1998) (quoting Mosley v. State, 241 Ala. 132, 136, 1 So.2d 593, 595 (1941)). ‘Further, “[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.” ’ Vanpelt v. State, 74 So.3d 32, 90 (Ala.Crim.App.2009) (quoting Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005)). That is, ‘the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.’ Mitchell [v. State, 84 So.3d [968, 992 (Ala.Crim.App.2010) ]. See also State v. Storey, 40 S.W.3d 898, 910-11 (Mo.2001) (holding that no error resulted from the prosecutor’s characterization of mitigation as excuses because the ‘State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentenced and] the State is free to argue that the evidence is not mitigating at all’).”
McCray v. State, 88 So.3d at 29.
Viewing the prosecution’s argument as a whole, we find no error and, therefore, no plain error, in the characterization of some of Woodward’s proffered mitigation as excuses. The prosecutor permissibly asserted that the proffered mitigation was entitled to no weight because it was not truly mitigating.
B.
Woodward argues that the one of the prosecutors erred when she argued that the “excuses” personally offended her and that the district attorney erred when she argued during rebuttal that she was offended that Woodward had used and sacrificed his children by having them testify at the sentencing hearing. Woodward did not object to either comment when it was made. The jury recommended a sentence of life imprisonment without parole; there *1046 fore, any error in the prosecution’s arguments was harmless. Ferguson v. State, 814 So.2d 925, 948-49 (Ala.Crim.App.2000). Having reviewed the comments in the context in which they were made, however, we find no error. The prosecutors were not stating personal opinions regarding the ultimate issue to be decided by the jury. Rather, the prosecutors were presenting their impressions of the evidence and testimony proffered by Woodward as mitigation, and of the defense strategy of calling Woodward’s young children to testify. The arguments did not cross the line of what is permissible, and they certainly did not seriously affect Woodward’s substantial rights or have an unfair impact on the jury’s deliberations.
C.
Woodward next argues that the prosecution made several comments that improperly encouraged the jury to impose the death sentence based on comparisons between the life choices Woodward made and the life choices the victim made. Woodward objected to only one of the comments, and he did not receive an adverse ruling on the objection; therefore, we review this issue for plain error only.
The prosecution argued that Woodward had made choices in his life that supported the three aggravating circumstances the State had proffered: that Woodward had been previously convicted of a violent felony; that he killed Officer Houts to avoid an arrest as an ex-felon in possession of a pistol; and that he killed Officer Houts to disrupt the enforcement of the law. The prosecution argued that Woodward made the choices that placed him in the position that warranted the death penalty, including choosing death for Officer Houts. The prosecution also said that Officer Houts had made the choice to serve his country and his community.
The prosecution’s comments were reasonable inferences from the evidence and the prosecution’s summation of the evidence it believed supported the aggravating-circumstances findings. The comments were not, as Woodward has argued, similar to those in McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), comparing the appellant’s rights to those of the victim’s. Even if we found the prosecution’s comments here to have been improper, however, we would have found, as we did in McNair, that the comments did not rise to the level of plain error. McNair v. State, 653 So.2d at 336-38 (though it was improper for the prosecutor to have made numerous references to the victim’s rights and implied that his rights were to be weighed against the appellant’s rights, the remarks were uttered in the heat of debate and were valued as such by the jury). Moreover, the jury here did not recommend a death sentence for Woodward, so any error in that regard would have been harmless.
D.
Woodward next contends that in its rebuttal argument the prosecution improperly commented on his failure to testify, and he cites Ex parte Williams, 461 So.2d 852 (Ala.1984), for the proposition that a direct reference to a defendant’s failure to testify requires reversal. The prosecution did not comment on Woodward’s failure to testify.
During his closing argument to the jury at the penalty phase defense counsel argued: “There cannot be a more stark, moral choice for you, ladies and gentlemen, to have to make. Look at him sitting over there. There he is, he sits there. You didn’t get to hear from him.” (R. 1654.) During its rebuttal argument the State argued:
*1047 “What hit me as I was listening to the testimony and to the words today is, you were bombarded with lots of words yesterday. And I wrote this down: “You didn’t get to hear from the defendant.’ But let me submit to you this: Actions speak louder than words; don’t they? You’re not hearing through other people. Look at what he did. Look at what he did with his life.”
(R. 1675.)
Clearly the prosecution was not commenting on Woodward’s failure to testify, but was quoting defense counsel’s own argument. This was a permissible reply in kind to defense counsel’s argument. Stanley v. State, [Ms. CR-06-2236, April 29, 2011] — So.3d - (Ala.Crim.App.2011). See also Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999) (“A prosecutor has a right to reply in kind to the argument of defense counsel. This ‘reply-in-kind’ doctrine is based on fundamental fairness.”).
No error occurred as a result of the prosecution’s direct quotation of defense counsel’s statement to the jury.
E.
Woodward next argues that, when the prosecution urged the jury to sentence Woodward to death because the death penalty is a deterrent, it was impermissibly arguing deterrence as a nonstatutory aggravating circumstance. Woodward acknowledges that this Court has previously rejected the argument that the invocation of deterrence in closing argument is reversible error, but he disagrees with this Court’s prior holding on that issue.
The Alabama Supreme Court has stated: “[U]rging the jury to render a verdict in such a manner as to punish the crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument.” Ex parte Walker, 972 So.2d 737, 747 (Ala.2007), quoting Sockwell v. State, 675 So.2d 4, 36 (Ala.Crim.App.1993). We are bound by precedent established by the Alabama Supreme Court and find no error in the prosecution’s comment. We note, too, that the jury did not return a verdict recommending the death sentence for Woodward.

Conclusion

We have examined Woodward’s allegations of improper prosecutorial argument and have found no error. The prosecutors did not misstate the law, present personal opinions, draw improper comparisons between Woodward and the victim, or comment on Woodward’s failure to testify. Furthermore, the prosecution did not err when it argued deterrence as a reason to sentence Woodward to death. No individual comments constituted error; the complained-of comments, cumulatively, also did not constitute error. Woodward is not entitled to any relief on this claim.
XVI.
Woodward argues that the trial court erred when it permitted the use of an offense he committed when he was a juvenile to support an aggravating circumstance — that he had previously been convicted of a violent felony, § 13A-5-49(2), Ala.Code 1975. He argues that the Eighth Amendment prohibits sentencing capital offenders to death if the offender was under the age of 18 at the time of the offense, Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and he contends that consideration of a prior felony committed when he was a juvenile is prohibited as an indirect use of a juvenile offense as an aggravating circumstance. Woodward did not raise this argument in *1048 the trial court, so we review it for plain error only.
The State presented evidence at the penalty phase of Woodward’s trial to establish that Woodward had a prior conviction for manslaughter, and Woodward acknowledged to the jury that he had been convicted of manslaughter and that that conviction could be used as an aggravating circumstance. (R. 1368.) The jury found that aggravating circumstance to exist, as did the trial judge in his sentencing order. Although Woodward was a juvenile when he committed the crime, he was tried as an adult and was convicted and sentenced to 15 years’ imprisonment. (C. 918.) Therefore, the conviction was properly considered by the trial court as an aggravating circumstance. Yancey v. State, 65 So.3d 452, 477-78 (Ala.Crim.App.2009). The opinion in Yancey was rendered years after the decision in Roper; the reasoning in Roper did not then, and it does not now, prohibit the consideration, as an aggravating circumstance, of a prior adult conviction for a crime of violence, even if the crime was committed when the offender was under the age of 18. We agree with the reasoning expressed in United States v. Wilks, 464 F.3d 1240 (11th Cir.2006), in which the United States Court of Appeals for the Eleventh Circuit held that the reasoning in Roper did not prohibit using a youthful-offender conviction to enhance the sentence of an adult offender. The Court stated:
“Roper held only that the Eighth Amendment prohibits sentencing capital offenders to death if the offender was under the age of eighteen at the time of the offense.
“Our conclusion that youthful offender convictions can qualify as predicate offenses for sentence enhancement purposes remains valid because Roper does not deal specifically — or even tangentially — with sentence enhancement. It is one thing to prohibit capital punishment for those under the age of eighteen, but an entirely different thing to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood. Roper does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday.”
United States v. Wilks, 464 F.3d at 1243.
Woodward is not entitled to relief on this claim of error.
XVII.
Woodward argues that the trial court erred when it denied his motion for a change of venue because, he says, the trial court failed to consider inflammatory and prejudicial comments posted by readers in response to articles in the online version of the local newspapers and on other Internet Web sites. He contends that the Internet sources, when considered with traditional news sources, demonstrated pervasive, prejudicial publicity in Montgomery County that necessitated a change of venue.
Before trial Woodward filed a motion for a change of venue in which he cited numerous news reports about the crime, the victim, and the perpetrator. He stated that “much of what has been reported in the media about the case is inadmissible.” (C. 320.) He also quoted statements from letters to the editor in the local newspaper and from various Internet postings that, he said, showed “a visceral hatred” of him and would lead one to conclude that he could not get a fair trial in Montgomery County as a result of the presumptive prejudice. (C. 313.) The State of Alabama filed a response to Woodward’s motion and argued that a change of venue was not warranted. The trial court held a hearing on the motion; after considering Woodward’s motion and the attached ex *1049 hibits, the State’s response, and the parties’ arguments on the issue, the trial court denied the motion. The trial court stated that the publicity had focused on the death of the police officer, and that the issue of who had committed the killing had not been prejudged in the newspapers. (R. 58.)
Woodward’s primary argument on appeal is that, in so ruling, the trial court failed to consider “new media sources”— i.e., the comments made on the Internet— and that consideration of those online comments in addition to traditional news sources demonstrated that a change in venue was required. We disagree.
First, to the extent Woodward argues that the trial court failed to consider Internet comments when evaluating Woodward’s motion for a change of venue, the record reveals otherwise. During the hearing on the motion for a change of venue, when Woodward initially stated, “I believe the Court has received and read both my motion with its several attachments,” the trial court responded, “Several.” (R. 86.) Woodward than provided the prosecution and the trial court with another online news article and called the court’s attention to the reader comments posted after the article, arguing that the defense had established presumptive prejudice based on all the publicity and comments associated with the media articles. Woodward then discussed and quoted from many of the Internet posts he had included along with the motion, and the trial court knowledgeably commented on some of the posts, and clearly stated that it had read and considered Woodward’s motion. (R. 46.) Thus, the record belies Woodward’s primary assertion — that the trial court had failed to consider the “new” media sources in the form of online comments and posts.
Second, to the extent Woodward argues that the trial court erred when it denied the motion for a change of venue because the community was saturated with prejudicial pretrial publicity, we disagree.
“The right of an accused to be tried by a fair and impartial jury is guaranteed by the Sixth Amendment of the United States Constitution which states that ‘In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury....’ Article I, § 6 of the Alabama Constitution of 1901 states, in part: ‘That in all criminal prosecutions, the accused has a right to ... a speedy, public trial, by an impartial jury....’
“The Supreme Court of the United States has held that if an accused can not obtain an impartial jury in the district where he is being tried then the court should transfer the case to another district where the jurors are free of bias. Rideau v. Louisiana, 373 U.S. 723 (1963). This guarantee has also been codified in this state in Ala.Code 1975, § 15-2-20. Rule 10.1, Ala. R.Crim. P., is to the same effect.”
Hunt v. State, 642 So.2d 999, 1042 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
Rule 10.1(b), Ala. R.Crim. P., provides: “The burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” A trial court’s ruling on a motion for a change of venue is reviewed for an abuse of discretion.
“ ‘Absent a showing of abuse of discretion, a trial court’s ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the *1050 defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 388 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App.1978).”
Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985).
When a defendant alleges that “presumed prejudice” exists, the defendant must show that pretrial publicity is sufficiently prejudicial and inflammatory and that the prejudicial pretrial publicity saturated the community where the trial was to be held. Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). “‘Publicity’ and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.” Hunt v. State, 642 So.2d at 1043. Rather, a defendant alleging presumed prejudice must show that “a feeling of deep and bitter prejudice exists in [the county] as a result of the publicity.” Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990), citing Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, Ex parte Holladay, 549 So.2d 135 (Ala.1989).
In determining whether the “presumed-prejudice” standard exists the trial court must consider the totality of the surrounding circumstances. Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive-prejudice standard is “rarely” applicable, and is reserved for only “extreme situations.” Coleman v. Kemp, 778 F.2d at 1537.
Finally, a trial court’s ruling on a change-of-venue motion is not lightly overturned.
“[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.”
Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983), quoted in Joiner v. State, 651 So.2d 1155, 1156 (Ala.Crim.App.1994).
Woodward presented the trial court with numerous anonymous posts from online Internet sites. Although we agree with Woodward that some of the comments were inflammatory, nothing in the record indicates that the online comments by anonymous posters were the equivalent of proof of the “deep and bitter prejudice” in the entire county resulting from media coverage. Rather, as the State correctly pointed out at the hearing, the evidence indicated that many of the postings were not submitted by residents of Montgomery County, and it is clear from exhibits that the posts represented personal opinion and commentary and were not created by news writers or offered as news coverage. Nothing in the record even warrants an inference that those online statements were widely read by Montgomery County residents who made up the potential pool of jurors. Furthermore, nothing in the record indicates that the posted entries reflected the fixed opinions of anyone who might be in the pool of the potential jurors or even the general public in Montgomery County at the time of Woodward’s trial.
*1051 In McMillan v. State, [Ms. CR-08-1954, Nov. 5, 2010] — So.3d - (Ala.Crim.App.2010), this Court rejected an argument similar to the one Woodward has raised here. We held, in relevant part:
“Despite McMillan’s reference to certain unflattering comments made on blogs on certain Web sites, this alone did not require a change of venue. See United States v. Happ, (No. CR2-06-129(8), November 25, 2008) (S.D.Ohio 2008) (not reported in F.Supp.2d) (‘the presence of a web blog containing negative articles regarding Happ does not require a change of venue to another district. The coverage on that blog has not created an inflammatory, circus-like atmosphere in the court-house and the Columbus jury pool. Foley [v. Parker], 488 F.3d [377] at 387 [ (2007) ]. Furthermore, web based coverage is not localized and has an equal potential to taint a jury pool in any district.’). Gotb-aum v. City of Phoenix, 617 F.Supp.2d 878, 881-82 (D.Ariz.2008) (‘To be sure, some of the blog statements are disturbingly malicious. The question before the Court, however, is not whether the blog authors could serve as fair and impartial jurors, but whether an impartial jury can be selected from among the 1.6 million citizens, from five counties, who make up the Court’s jury pool.’). State v. Berecz, (No. 08CA48, January 21, 2010)(Ohio Ct.App.2010) (not reported in N.E.2d) (‘In the absence of showing resulting bias, “pretrial publicity— even pervasive, adverse publicity — does not inevitably lead to an unfair trial.” State v. Lundgren, 73 Ohio St.3d 474, 479, 1995-Ohio-227, 653 N.E.2d 304, quoting Nebraska Press Assn. v. Stewart [Stuart ] (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.’).”
McMillan v. State, — So.3d at -.
As in McMillan, we find that the unsolicited, unreviewed, largely anonymous online comments did not rise to the level of saturated, prejudicial media coverage. Moreover, we believe that any readers of the comments would value those comments at their true worth and not as “news coverage” at all.
As for Woodward’s allegations that the news articles in print and online also established proof that a change of venue was necessary, we disagree. Certainly the shooting of a Montgomery police officer during the course of a traffic stop and the arrest and upcoming trial of the accused shooter generated widespread media coverage. That fact, alone, however, could not support a finding of presumed prejudice. The media coverage, moreover, contained largely factual reports about the shooting and the events surrounding Officer Houts’s death and about the investigation and prosecution. The reports were not inherently prejudicial, inflammatory, or sensational. Furthermore, the publicity surrounding the case diminished substantially in the nearly two years between the shooting and the time of trial. “The passage of time tends to bring objectivity to a case in which there has been extensive pretrial publicity.” Ex parte Fowler, 574 So.2d 745, 748-49 (Ala.1990).
The presumptive-prejudice standard recognized in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is to be applied only in extreme situations in which a defendant can show that he or she cannot receive a fair trial because the community was so saturated with prejudicial pretrial publicity. Woodward did not make a showing that his case is in that rare category. We hold that the trial court did not abuse its substantial discretion when it denied Woodward’s motion for a change of venue.
XVIII.
Woodward next argues that the trial court erred when it failed to conduct a *1052 reasonable inquiry into juror misconduct upon learning that a juror had spoken to a news reporter during a break in the trial. He argues that a remand is required to conduct an inquiry into possible juror misconduct.
During a recess near the beginning of the trial the court informed the parties that a deputy told the court that he had seen a reporter for a local television station talking to one of the jurors. The court stated that the deputy told the reporter not to talk to the jurors. The trial court brought the reporter into the courtroom and, in the presence of both parties, asked the reporter about the incident. The reporter explained that she knew the juror because the juror worked at a department store, and they had spoken about the juror’s job. The trial court asked the reporter if the only topic she and the juror had discussed was the juror’s job, and the reporter assured the court that it was, and she said she would not speak to the juror anymore during the trial. (R. 844-45.)
After the trial court spoke to the reporter, Woodward did not make raise any objections or request any additional action from the trial court. Woodward now argues that the trial court failed to conduct a reasonable investigation of the contact between the juror and the reporter and that the court failed to protect his constitutional rights. Woodward raised no objection in the trial court about the court’s resolution of the issue; therefore, we review Woodward’s argument only for plain error.
First, Woodward does not argue what the trial court failed to do and what additional actions by the trial court would have constituted a “reasonable inquiry” by the court.
Second, we find that the trial court did, in fact, conduct a reasonable inquiry under the circumstances and we find no reason to remand the case for additional proceedings, particularly in view of the fact that Woodward did not indicate any dissatisfaction with the trial court’s inquiry, did not raise an objection at trial when the trial court conducted the inquiry into the matter, and did not make a motion for a mistrial when the trial court completed its inquiry.
“Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion.” Gaffney v. State, 342 So.2d 403, 404 (Ala.Crim.App.1976). “An unauthorized contact between the jurors and a witness does not necessarily require the granting of a mistrial. It is within the discretion of the trial court to determine whether an improper contact between a juror and a witness was prejudicial to the accused.” Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), quoted in Knox v. State, 571 So.2d 389, 391 (Ala.Crim.App.1990).
“In Holland v. State, 588 So.2d 543 (Ala.Crim.App.1991), a case involving alleged juror contamination, this court reversed because the trial court undertook no inquiry into the circumstances of the alleged improper communication. We observed that
“ ‘[a] motion for mistrial “is addressed to the sound discretion of the trial court, and its ruling will not be reversed in the absence of a clear showing of abuse of discretion.” Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala.1985), cert, denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986). In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion “where the trial court investigates the circumstances under which the remark was made, its substance, and determines *1053 that the rights of the appellant were not prejudiced by the remark.” Bascom v. State, 344 So.2d 218, 222 (Ala.Crim.App.1977). However, the trial judge has a duty to conduct a “reasonable investigation of irregularities claimed to have been committed” before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Crim.App.1984).’
“Holland, 588 So.2d at 546. What constitutes a ‘reasonable investigation of irregularities claimed to have been committed’ will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.”
Sistrunk v. State, 596 So.2d 644, 648 (Ala.Crim.App.1992).
Upon being informed by a deputy about the contact between the juror and the reporter, the trial court informed the parties, then exercised its considerable discretion by questioning the reporter about the content of the conversation. After being assured by the reporter that the conversation was unrelated to the trial, the court admonished the reporter and was satisfied with the inquiry, and all indications were that Woodward was satisfied as well. There being no indication that the conversation was related to the trial, there was no reason to conduct additional inquiry to determine whether the other jurors would have been affected by a conversation unrelated to the trial. Woodward’s failure to raise any objection to the scope of the trial court’s inquiry at the time it was conducted weighs against his claim of prejudice now. We find no abuse of discretion in the trial court’s decision to forgo additional inquiry into the matter, and we certainly find no plain error in the trial court’s failure to conduct additional inquiry under these circumstances.
Woodward is not entitled to relief on this claim.
XIX.
Woodward argues that the trial court violated Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in several ways. He argues that the trial court violated Ring: When it failed to require the State to provide pretrial notice of the aggravating circumstances it intended to prove; when it permitted the State to prosecute the case even though it did not allege the aggravating circumstances in the indictment; and when it overrode the jury’s sentencing recommendation of life imprisonment without the possibility of parole. Alabama law is directly contrary to Woodward’s claims of error.
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that defendants in capital cases “are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment.” Ring, 536 U.S. at 589. Alabama’s death-penalty statute, which provides for a jury’s recommendation as to sentencing and places ultimate sentencing authority in the trial court, was not invalidated by Ring. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003).
A.
In Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), this Court considered, and rejected, the first two claims Woodward now raises:
“This Court, in Stallworth v. State, specifically rejected an argument virtu *1054 ally identical to Lewis’s — namely, that ‘the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances’ that supported the capital offense. 868 So.2d [1128] at 1186 [ (Ala.Crim.App.2001) ]. We rejected Stallworth’s argument, holding that neither Ring v. Arizona nor Apprendi v. New Jersey modified prior Alabama caselaw, ‘which holds that aggravating circumstances do not have to be alleged in the indictment.’ 868 So.2d at 1186. The indictment returned against Lewis advised him of the crime with which he was charged — the capital offense of murder during kidnapping, in violation of § 13A-5-40(a)(l), Ala.Code 1975 — and set forth the elements of the offense that the State was required to prove. Included in the indictment was the aggravating circumstance of kidnapping in the first degree, thus ’placing Lewis on notice that, if convicted, he could be facing a death sentence. Because this single aggravating circumstance placed Lewis on notice that, if convicted of the charged offense he could be facing a potential death sentence, it was unnecessary for the State to amend the indictment so that it included all of the aggravating circumstances the State intended to prove at trial.
“Likewise, neither Ring v. Arizona nor Apprendi v. New Jersey requires that an accused be provided with advance notice of all aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances listed in § ISA-5-49 that are not elements of a capital offense:
“ ‘The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Crim.App.1982), aff'd, 435 So.2d 1351 (Ala.1983). A defendant has no right to advance notice of the state’s intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir.1987); Knotts v. State, 686 So.2d 431 (Ala.Crim.App.[1995]); Ruffin v. State, 397 So.2d 277, 282 (Fla.1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements.’
“Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). Cf. Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when aggravating circumstances relied on by the State are elements of the capital offense they must be charged in the indictment).”
Lewis v. State, 24 So.3d at 534-35.
Woodward is not entitled to relief on either of his first two claims for relief; he received the notice of aggravating circumstances he was legally due.
B.
The Alabama Supreme Court has also rejected Woodward’s third argument— that Ring requires that a jury and not a trial court determine whether the aggravating circumstances outweigh the mitigating circumstances. “The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504 (1995), which upheld § 13A-5- *1055 47(e), Ala.Code 1975—commonly referred to as the judicial-override statute—against constitutional attack.” Tomlin v. State, 909 So.2d 213, 282 (Ala.Crim.App.2002), rev’d on other grounds, 909 So.2d 283 (Ala.2003). Woodward acknowledges that in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court held that the weighing of the aggravating circumstances and the mitigating circumstances is not a factual determination that must be made by a jury, but he argues that the Alabama Supreme Court’s ruling was wrong. Having faced previous challenges to the holding in Ex parte Waldrop, this Court has stated: “The decision in Ex parte Waldrop has been consistently followed and upheld.” Stanley v. State, [Ms. CR-06-2236, April 29, 2011] - So.3d -, - (Ala.Crim.App.2011), citing Mitchell v. State , 84 So.3d 968, 989 (Ala.Crim.App.2010); Spencer v. State, 58 So.3d 215, 248 (Ala.Crim.App.2008); Yeomans v. State, 898 So.2d 878, 903 (Ala.Crim.App.2004); Ex parte McNabb, 887 So.2d 998, 1005-06 (Ala.2004). Furthermore, as we again stated in Stanley, this Court is bound by Ex parte Waldrop, as we are bound by all decisions of the Alabama Supreme Court. Id. at -. See also § 12-3-16, Ala.Code 1975 (“The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328.”).
The jury unanimously found the existence of two aggravating circumstances—that Woodward had previously been convicted of a violent felony, § 13A-5-49(2), Ala.Code 1975, and that Woodward committed the capital murder to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws, § 13A-5-49(7), Ala.Code 1975. Only one aggravating circumstance must exist in order to impose a sentence of death, § 13A-5-45(f), Ala.Code 1975, and a jury’s finding of just one aggravating circumstance complies with the requirement in Ring that a jury make a factual determination that makes a defendant eligible for the death penalty. Ex parte Waldrop, 859 So.2d at 1188-90. The process of weighing the aggravating and mitigating circumstances was for the sentencer, the trial court, to perform.
Woodward is not entitled to relief on any of the Ring claims.
XX.
Woodward argues that Alabama’s capital-sentencing scheme is unconstitutional for several reasons. He argues that execution of an offender following a recommendation by a jury of a sentence of life imprisonment without the possibility of parole violates the Eighth Amendment and the nation’s evolving standards of decency, and it results in the arbitrary imposition of the death penalty. He argues, also, that Alabama’s judicial-override system has no meaningful regulation of the sentencing roles of juries and trial courts, and that results in the arbitrary, unequal application of the death sentence.
The majority of Woodward’s arguments have been considered and rejected by the appellate courts of this State, and some have also been considered and rejected by the United States Supreme Court. See, e.g., Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995);[12] Ex parte Hodges, 856 So.2d 936
*1056 (Ala.2003). As we discussed in Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010):
“Initially, this Court notes that the Constitution of the United States does not prohibit vesting the final sentencing authority in the circuit court. See Spaziano v. Florida, 468 U.S. [447 (1984) ]. Further, in Harris v. Alabama, the Supreme Court of the United States held that Alabama’s sentencing standard, which (at that time) required only that the judge consider the jury’s advisory opinion, was ‘consistent with established constitutional law.’ 513 U.S. 504, 511 (1995). The Court went on to explain that ‘the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict.’ Id. at 512.
“Therefore, Mitchell’s argument that Alabama’s judicial-override provision is unconstitutional is without merit.
“Moreover, Alabama’s judicial-override provision is not, as Mitchell asserts, standardless. In rejecting the argument that Alabama’s judicial-override provision is standardless, the Alabama Supreme Court has held:
“ ‘This Court in Ex parte Apicella, 809 So.2d 865 (Ala.2001), upheld the constitutionality of having a judge, not the jury, determine the punishment in a capital case. In Ex parte Taylor, 808 So.2d 1215 (Ala.2001), this Court held that the capital-sentencing procedure set forth in §§ 13A-5-47 and 13A-5-53, Ala.Code 1975, provided sufficient guidance to prevent the arbitrary and capricious imposition of a death sentence. Specifically, the Court noted that the capital-sentencing procedure “ensures that the trial judge is given adequate information and sufficient guidance in deciding whether to accept or to reject a jury’s recommended sentence” and that § 13A-5-53, Ala.Code 1975, provided sufficient guidelines for an appellate determination of “whether a trial judge’s override of the jury’s recommendation is appropriate in a particular case.” 808 So.2d at 1219.’
“Ex parte Jackson, 836 So.2d 979, 989 (Ala.2002). See also Ex parte Carroll, 852 So.2d 833, 836 (Ala.2002) (establishing standard under which the circuit court must weigh a juiy’s recommendation of life in prison without the possibility of parole). Accordingly, Mitchell’s argument that Alabama’s judicial-override provision is ‘standardless’ and thus ‘unconstitutional’ is without merit.”
Mitchell v. State, 84 So.3d at 968. (Footnote omitted.)
Woodward claims that the evolving standards of decency and “world opinion” demonstrate an opposition to imposing the death sentence on an offender for whom a jury recommended a sentence of life imprisonment without parole. He also argues that judicial override of a jury’s recommended sentence of life imprisonment violates the Eighth Amendment’s proportionality principle, and he cites Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The rationale of those cases does not support Woodward’s claim, however.
In Kennedy, the United States Supreme Court held that the Eighth Amendment prohibits the death penalty for rape of a *1057 child where the crime did not result in the death of the victim. In Roper v. Simmons, the United States Supreme Court held that “[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.” 548 U.S. at 578. Kennedy, Roper, and Atkins each limit application of the death penalty and proscribe execution of certain categories of defendants, but none of the cases apply to the death penalty generally or to the system of judicial override.
In Spaziano v. Florida, the United States Supreme Court long ago stated, when reviewing Florida’s capital-sentencing statute:
“We are not persuaded that placing the responsibility on a trial judge to impose the sentence in a capital case is so fundamentally at odds with contemporary standards of fairness and decency that Florida must be required to alter its scheme and give final authority to the jury to make the life-or-death decision.”
468 U.S. 447, 465, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The Supreme Court’s opinions in Kennedy, Roper, or Atkins do not indicate a reversal of the Court’s prior determination that a capital-sentencing system providing for judicial override of a jury’s recommended verdict is constitutional. Woodward’s expansive reading of those eases is unwarranted.
The majority of the arguments Woodward raises in support of his claims have been considered and rejected, and all of the claims are meritless. For all the foregoing reasons, Woodward’s arguments as to the constitutionality of Alabama’s capital-sentencing statute are due to be rejected.
XXI.
Woodward makes the following general argument as to the constitutionality of the death penalty:
“Objective evidence of the nation’s evolving standards of decency indicates that the death penalty violates the Eighth Amendment. Legislatures across the country are clearly moving toward abolition, and the annual execution tally has fallen in recent years. Therefore, the death penalty violates the Eighth Amendment, and reversal of Mr. Woodward’s death sentence is required.”
(Woodward’s brief, at p. 149.)(Footnotes omitted.)
Woodward did not raise this argument in the trial court, so we review it for plain error only, and we find no plain error. The argument Woodward raises on appeal has been considered and rejected by this Court and by the Alabama Supreme Court. See Mitchell v. State, 84 So.3d 968, 983 (Ala.Crim.App.2010), and cases cited therein. Additionally, when considering whether Kentucky’s lethal injection protocol satisfied the Eighth Amendment, the United States Supreme Court said, ‘We begin with the principle, settled by Gregg [v. Georgia, 428 U.S. 153 (1976)], that capital punishment is constitutional. See 428 U.S., at 177 (joint opinion of Stewart, Powell, and Stevens, JJ.).” Baze v. Rees, 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).
Woodward offers no binding precedent in support of his argument, and this Court is not free to reexamine or overrule binding precedent from higher courts on this issue.
Woodward is not entitled to relief on this claim.
*1058 XXII.
Woodward argues that the cumulative effect of the errors enumerated in his brief requires a reversal of his conviction and sentence.
“[W]hen no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001). The Court further explained cumulative-error analysis as follows:
“[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.”
Id., quoting Rule 45, Ala. R.App. P.
After applying the cumulative-error standard set out in Ex parte Woods, supra, to Woodward’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence indicating that the cumulative effect of any of the aforementioned nonreversible errors in this case affected Woodward’s substantial rights at trial.
Woodward is not entitled to any relief on his claim of cumulative error.
XXIII.
As required by § 13A-5-53, Ala. Code 1975, we will address the propriety of Woodward’s death sentence.
Woodward was convicted of two counts of capital murder, murder of a police officer while the officer was on duty, a violation of § 13A-5-40(a)(5), Ala.Code 1975, and murder by firing a weapon from inside a vehicle, a violation of § 13A-5-40(a)(18), Ala.Code 1975.
Pursuant to § 13A-5-53(a), Ala.Code 1975, we have reviewed the sentencing proceedings and we find no error adversely affecting Woodward’s rights during those proceedings. Before determining the sentence, the trial court considered all of the available evidence, including the presentence investigation report, and heard arguments about the aggravating and mitigating circumstances. In its sentencing order, the circuit court entered written findings of fact summarizing the offense and Woodward’s participation in it. The trial court also made specific written findings about the aggravating and mitigating circumstances. The court stated it found two aggravating circumstances: 1) Woodward was previously convicted of a felony involving the use or threat of violence, § 13A-5-49(2), Ala.Code 1975; and 2) Woodward committed the murder to disrupt or hinder the enforcement of laws, § 13A-5-49(7), Ala.Code 1975. The trial court considered the statutory mitigating circumstances and found that none applied in this case. The court found nonstatutory mitigating circumstances offered by Woodward to exist: 1) that Woodward had a good relationship with his children; and 2) that Woodward grew up in a dysfunctional family. The trial court considered the jury’s 8-4 recommendation for a sentence of life imprisonment without the possibility of parole as the third mitigating factor, see Ex parte Carroll, 852 So.2d 833 (Ala.2002), and indicated it gave that factor most weight.
The trial court then weighed the aggravating and mitigating circumstances and, with a well reasoned and thorough explanation for its reasons, determined that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Woodward to death. The process of weighing the aggravating and miti *1059 gating circumstances — of determining the weight to attach to the circumstances — is a matter that is strictly within the discretion of the trial court. Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). The trial court clearly gave the mitigating circumstances proffered by Woodward little weight. The record fully supports the trial court’s findings, and we commend the trial court for its thorough sentencing order. The record does not reflect that Woodward’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A — 5—53(b)(1), Ala.Code 1975.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating and mitigating circumstances in order to determine whether Woodward’s death sentence is proper. We have independently weighed the aggravating circumstances and the mitigating circumstances, and we find that Woodward’s death sentence is appropriate.
Section 13A-5-53(b)(3), Ala.Code 1975, requires this Court to determine whether Woodward’s death sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. Woodward was convicted of one count of murder of a police officer while the officer was on duty and one count of murder by firing a weapon from inside a vehicle. Sentences of death have been imposed for similar crimes in this State. See Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011); Woods v. State, 13 So.3d 1 (Ala.Crim.App.2007); McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2001), aff'd, 887 So.2d 998 (Ala.2004) (all imposing death sentence in for murder of police officers). Considering both the crime committed and the defendant, this Court finds that Woodward’s death sentence is neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Woodward’s substantial rights, see Rule 45A, Ala. R.App. P., and we have found none.
Woodward’s convictions and death sentence are due to be, and are hereby, affirmed.
AFFIRMED.
WINDOM, KELLUM, BURKE, and JOINER, JJ., concur.

. The trial court stated "Wendy Williams,” which the court reporter indicated was an error by placing “(sic)” after the court said that name. (R. 1238.) Therefore, we presume that the trial court intended to give the name of the trial witness, Wendy Walker.

. Additional discussion revealed that the district attorney had not intended for Parker to testify about the statement, and she agreed not to mention the statement in her closing argument to the jury. (R. 1241.)

. In fact, it was through investigators’ questioning of those same witnesses that they learned that Woodward was in Atlanta.

. The State correctly notes that two witnesses had already testified that the driver of the Impala they saw in the area at the time of the shooting was a black male. (R. 786, 833.)

. Rule 702, Ala. R. Evid., has been amended. The amendment, effective January 1, 2012, keeps this provision in subsection (a) and adds subsections (b) and (c).

. Rule 702 was amended effective January 1, 2012. See supra note 5.

. Rule 701 and Rule 702 of the Tennessee Rules of Evidence are substantively identical to Rule 701. Ala. R. Evid.. and to Rule 702. Ala. R. Evid., before the amendment to Rule 702.

. A recording and a transcript of Woodward's telephone call were admitted into evidence at the sentencing hearing before the trial court. (C. 1260, R. 1722.)

. The videotape does not contain a statement by Woodward, so compliance with the seventh requirement of Voudrie — -a showing that any statement made in the recording was made voluntarily — was not necessary.

. We acknowledge that in Boyd v. State, 746 So.2d 364, 398 (Ala.Crim.App.1999), this Court stated in dicta that § 13A-5-47, Ala. Code 1975, does not provide for the presentation of mitigation evidence at a sentencing hearing before the trial court. “Because obi-ter dictum is, by definition, not essential to the judgment of the court which states the dictum, it is not the law of the case established by that judgment. Gray v. Reynolds, 553 So.2d 79, 81 (Ala.1989).” Ex parte Williams, 838 So.2d 1028, 1031 (Ala.2002).

. "The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority." Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000).

. Woodward acknowledges in a footnote of his brief that the United States Supreme Court has upheld Alabama’s sentencing-override scheme against an arbitrariness chai- *1056 lenge, citing Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). He argues, however, that Hairis should be overruled. (Woodward’s brief, atp. 145 n. 89.) Of course, this Court has no authority to overrule decisions of the United States Supreme Court.